APPEAL,CLOSED,TYPE–E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:19–cv–01544–ABJ</u>
### *Internal Use Only*

| | |
|---|---|
| SCOTTS VALLEY BAND OF POMO INDIANS v. UNITED STATES DEPARTMENT OF THE INTERIOR et al | Date Filed: 05/24/2019 |
| Assigned to: Judge Amy Berman Jackson | Date Terminated: 09/30/2022 |
| Case in other court:  21–05009 | Jury Demand: None |
| USCA, 23–05162 | Nature of Suit: 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| Cause: 05:0706 Judicial Review of Agency Actions | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

| | | |
|---|---|---|
| **SCOTTS VALLEY BAND OF POMO INDIANS** | represented by | **Arlinda Faye Locklear**<br>LAW OFFICE OF ARLINDA LOCKLEAR<br>4113 Jenifer Street, Nw<br>Washington, DC 20015<br>202–237–0933<br>Email: <u>alocklearesq@verizon.net</u><br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Patrick Robert Bergin**<br>PEEBLES KIDDER BERGIN & ROBINSON LLP<br>2020 L Street<br>Suite 250<br>Sacramento, CA 95811<br>(916) 441–2700<br>Fax: (916) 441–2067<br>Email: <u>pbergin@ndnlaw.com</u><br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Tim Hennessy**<br>FREDERICKS PEEBLES & PATTERSON LLP<br>2020 L Street<br>Suite 250<br>Sacramento, CA 95811<br>(916) 441–2700<br>Fax: (916) 441–2067<br>Email: <u>thennessy@ndnlaw.com</u><br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

V.

**<u>Defendant</u>**

**UNITED STATES DEPARTMENT**
**OF THE INTERIOR**

represented by **Devon Lehman McCune**
U.S. DEPARTMENT OF JUSTICE
Environment and Natural Resources
Division
999 18th Street
South Terrace, Suite 370
Denver, CO 80202
(303) 844–1487
Fax: (303) 844–1350
Email: devon.mccune@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Claudia Antonacci Hadjigeorgiou**
U.S. DEPARTMENT OF JUSTICE
Environment and Natural Resources
Division
P.O. Box 7611
Washington, DC 20044–7611
(202) 305–0434
Fax: (202) 305–0506
Email: claudia.hadjigeorgiou@usdoj.gov
*TERMINATED: 04/01/2021*

**<u>Defendant</u>**

**DEB HAALAND**
*in her official capacity as Secretary of the*
*U.S. Department of the Interior*

represented by **Devon Lehman McCune**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**DAVID L. BERNHARDT**
*in his official capacity as Secretary of the*
*U.S. Department of the Interior*
*TERMINATED: 07/20/2021*

represented by **Devon Lehman McCune**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Claudia Antonacci Hadjigeorgiou**
(See above for address)
*TERMINATED: 04/01/2021*

**<u>Defendant</u>**

**BRYAN NEWLAND**
*in his official capacity as Assistant*
*Secretary for Indian Affairs of the U.S.*
*Department of the Interior*

represented by **Devon Lehman McCune**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**WIZIPAN GARRIOTT**
*in his capacity as Principal Deputy*
*Assistant Secretary for Indian Affairs of*
*the U.S. Department of the Interior*

represented by **Devon Lehman McCune**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Defendant</u>

**TARA SWEENEY**
*in her official capacity as Assistant*
*Secretary for Indian Affairs of the U.S.*
*Department of the Interior*
*TERMINATED: 08/27/2021*

represented by **Devon Lehman McCune**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Claudia Antonacci Hadjigeorgiou**
(See above for address)
*TERMINATED: 04/01/2021*

<u>Defendant</u>

**JOHN TAHSUDA**
*in his capacity as Principal Deputy to the*
*Assistant Secretary for Indian Affairs of*
*the U.S. Department of the Interior*
*TERMINATED: 08/27/2021*

represented by **Devon Lehman McCune**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Claudia Antonacci Hadjigeorgiou**
(See above for address)
*TERMINATED: 04/01/2021*

<u>Amicus</u>

**YOCHA DEHE WINTUN NATION**

represented by **Kirk R. Ruthenberg**
DENTONS US LLP
1900 K Street, NW
Washington, DC 20006
(202) 408–6410
Fax: (202) 496–7756
Email: kirk.ruthenberg@dentons.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Samantha R. Caravello**
KAPLAN KIRSCH & ROCKWELL, LLP
1675 Broadway
Suite 2300
Denver, CO 80202
(303) 825–7000
Fax: (303) 825–7005
Email: scaravello@kaplankirsch.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Adams**
KAPLAN, KIRSCH & ROCKWELL
One Sansome Street
Suite 2910

San Francisco, CA 94104
628–209–4151
Email: madams@kaplankirsch.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Paula M. Yost**
5022 Dublin Avenue
Oakland, CA 94602
510–501–7093
Email: pyost@yochadehe–nsn.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel E Kohn**
DENTONS US LLP
One Market Plaza, Spear Tower
24th Floor
San Francisco, CA 94105
(415) 882–5031
Email: samuel.kohn@dentons.com
*TERMINATED: 11/18/2019*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/24/2019 | 1 | COMPLAINT against All Defendants ( Filing fee $ 400 receipt number 0090–6146519) filed by SCOTTS VALLEY BAND OF POMO INDIANS. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons)(Bergin, Patrick) (Attachment 1 replaced on 5/28/2019) (zeg). (Entered: 05/24/2019) |
| 05/29/2019 | | Case Assigned to Judge Amy Berman Jackson. (zeg) (Entered: 05/29/2019) |
| 05/29/2019 | 2 | SUMMONS (4) Issued Electronically as to DAVID BERNHARDT, TARA SWEENEY, JOHN TAHSUDA, UNITED STATES DEPARTMENT OF THE INTERIOR. (Attachment: # 1 Notice and Consent)(zeg) (Entered: 05/29/2019) |
| 05/30/2019 | 3 | REQUEST FOR SUMMONS TO ISSUE filed by SCOTTS VALLEY BAND OF POMO INDIANS. (Attachments: # 1 Summons)(Bergin, Patrick) (Entered: 05/30/2019) |
| 05/30/2019 | 4 | NOTICE of Appearance by Arlinda F Locklear on behalf of All Plaintiffs (Locklear, Arlinda) (Entered: 05/30/2019) |
| 06/04/2019 | 5 | SUMMONS (2) Issued Electronically as to, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Summons for AG)(jf) (Entered: 06/04/2019) |
| 06/05/2019 | 6 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. JOHN TAHSUDA served on 5/30/2019 (Bergin, Patrick) (Entered: 06/05/2019) |
| 06/05/2019 | 7 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNITED STATES DEPARTMENT OF THE INTERIOR served on 5/30/2019, RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNITED STATES DEPARTMENT OF THE INTERIOR served on 5/30/2019 (Bergin, Patrick) (Entered: 06/05/2019) |
| 06/05/2019 | 8 | |

| | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DAVID BERNHARDT served on 5/30/2019 (Bergin, Patrick) (Entered: 06/05/2019) |
|---|---|---|
| 06/05/2019 | 9 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. TARA SWEENEY served on 5/30/2019 (Bergin, Patrick) (Entered: 06/05/2019) |
| 06/10/2019 | 10 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General June 6, 2019. (Bergin, Patrick) Modified on 6/14/2019 (jf). (Entered: 06/10/2019) |
| 06/10/2019 | 11 | ENTERED IN ERROR.....RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 6/6/2019. Answer due for ALL FEDERAL DEFENDANTS by 8/5/2019. (Bergin, Patrick) Modified on 6/14/2019 (jf). (Entered: 06/10/2019) |
| 06/14/2019 | | NOTICE OF CORRECTED DOCKET ENTRY: Document No. re 11 Summons Returned Executed as to US Attorney, was entered in error and counsel was instructed to refile said pleading. (jf) (Entered: 06/14/2019) |
| 06/14/2019 | 12 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 6/6/2019. Answer due for ALL FEDERAL DEFENDANTS by 8/5/2019. (Bergin, Patrick) (Entered: 06/14/2019) |
| 06/28/2019 | 13 | NOTICE of Appearance by Claudia Antonacci Hadjigeorgiou on behalf of DAVID BERNHARDT, TARA SWEENEY, JOHN TAHSUDA, UNITED STATES DEPARTMENT OF THE INTERIOR (Hadjigeorgiou, Claudia) (Entered: 06/28/2019) |
| 08/05/2019 | 14 | ANSWER to Complaint by DAVID BERNHARDT, TARA SWEENEY, JOHN TAHSUDA, UNITED STATES DEPARTMENT OF THE INTERIOR.(Hadjigeorgiou, Claudia) (Entered: 08/05/2019) |
| 08/13/2019 | 15 | NOTICE of Appearance by Tim Hennessy on behalf of SCOTTS VALLEY BAND OF POMO INDIANS (Hennessy, Tim) (Entered: 08/13/2019) |
| 08/14/2019 | | MINUTE ORDER. The parties shall meet, confer, and file a Joint Report pursuant to Local Civil Rule 16.3 by August 28, 2019. The parties' proposed briefing schedule should not anticipate the filing of simultaneous briefs. Rather, it should propose consecutive briefing as follows: a dispositive motion followed by a combined opposition and cross–motion, then a combined reply and cross–opposition, and a cross–reply, if needed. Dates contained in the report should be expressed as specific dates (month/day/year) rather than as time frames (e.g., "60 days after the entry of the scheduling order"). The Court will issue a scheduling order after reviewing the parties' Joint Report. SO ORDERED. Signed by Judge Amy Berman Jackson on 08/14/2019. (lcabj3) (Entered: 08/14/2019) |
| 08/14/2019 | 16 | Joint MOTION for Scheduling Order *and Report* by DAVID BERNHARDT, TARA SWEENEY, JOHN TAHSUDA, UNITED STATES DEPARTMENT OF THE INTERIOR (Attachments: # 1 Text of Proposed Order)(Hadjigeorgiou, Claudia) (Entered: 08/14/2019) |
| 08/20/2019 | | MINUTE ORDER. The Court hereby adopts the parties' proposed schedule. In the event a dispute arises concerning the administrative record, plaintiff must file its motion by December 17, 2019, defendant must file its response by January 22, 2020, and plaintiff's reply is due February 6, 2020. In the event that no record motion is filed, summary judgment briefing shall proceed as follows: plaintiff will file its motion for summary judgment by January 9, 2020, defendant will file its combined opposition and cross motion for summary judgment by February 13, 2020, plaintiff will file its combined opposition and reply by March 5, 2020, and defendant shall file its cross–reply by March 26, 2020. SO ORDERED. Signed by Judge Amy Berman Jackson on 08/20/2019. (lcabj3) (Entered: 08/20/2019) |
| 08/20/2019 | | |

| | | |
|---|---|---|
| | | MINUTE ORDER finding as moot 16 Motion for Scheduling Order. Signed by Judge Amy Berman Jackson on 08/20/2019. (lcabj3) (Entered: 08/20/2019) |
| 08/20/2019 | | Set/Reset Deadlines: In the event a dispute arises concerning the administrative record, plaintiff must file its motion by 12/17/2019, defendant must file its response by 1/22/2020, and plaintiff's reply is due 2/6/2020. (jth) (Entered: 08/20/2019) |
| 09/10/2019 | 17 | MOTION to Intervene *as Defendant* by YOCHA DEHE WINTUN NATION (Attachments: # 1 Memorandum in Support of Motion to Intervene, # 2 Declaration of Anthony Roberts, # 3 Proposed Answer, # 4 Text of Proposed Order)(Kohn, Samuel) (Entered: 09/10/2019) |
| 09/24/2019 | 18 | RESPONSE re 17 MOTION to Intervene *as Defendant* filed by SCOTTS VALLEY BAND OF POMO INDIANS. (Attachments: # 1 [Proposed] Order)(Bergin, Patrick) (Entered: 09/24/2019) |
| 10/01/2019 | 19 | REPLY to opposition to motion re 17 MOTION to Intervene *as Defendant* filed by YOCHA DEHE WINTUN NATION. (Attachments: # 1 Declaration of Anthony Roberts, # 2 Declaration of Samuel E. Kohn)(Kohn, Samuel) (Entered: 10/01/2019) |
| 10/04/2019 | 20 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Matthew G. Adams, :Firm– Dentons US LLP, :Address– One Market Plaza, Spear Tower, 24th Floor, San Francisco, CA 94105. Phone No. – (415) 882–0351. Fax No. – (415) 267–4198 Filing fee $ 100, receipt number 0090–6418721. Fee Status: Fee Paid. by YOCHA DEHE WINTUN NATION (Attachments: # 1 Declaration of Matthew G. Adams, # 2 Text of Proposed Order)(Kohn, Samuel) (Entered: 10/04/2019) |
| 10/04/2019 | 21 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Paula M. Yost, :Firm– Dentons US LLP, :Address– 1999 Harrison Street, Suite 1300, Oakland, CA 94612. Phone No. – (415) 882–5009. Fax No. – (415) 882–0300 Filing fee $ 100, receipt number 0090–6418801. Fee Status: Fee Paid. by YOCHA DEHE WINTUN NATION (Attachments: # 1 Declaration of Paula M. Yost, # 2 Text of Proposed Order)(Kohn, Samuel) (Entered: 10/04/2019) |
| 10/04/2019 | 22 | NOTICE of Appearance by Kirk R. Ruthenberg on behalf of YOCHA DEHE WINTUN NATION (Ruthenberg, Kirk) (Entered: 10/04/2019) |
| 10/09/2019 | | MINUTE ORDER granting 20 21 Motions for Leave of Matthew G. Adams and Paula M. Yost to Appear Pro Hac Vice only upon condition that the lawyers admitted, or at least one member of the lawyers' firm, undergo CM/ECF training, obtain a CM/ECF username and password, and agree to file papers electronically. No court papers will be mailed to any lawyer. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).For instructions visit: https://www.dcd.uscourts.gov/sites/dcd/files/NextGEN_Tutorial_for_Registering_for_E–filing.pdf.** Signed by Judge Amy Berman Jackson on 10/9/19. (DMK) (Entered: 10/09/2019) |
| 10/10/2019 | 23 | ADMINISTRATIVE RECORD *Notice of Filing Certified Index* by DAVID BERNHARDT, TARA SWEENEY, JOHN TAHSUDA, UNITED STATES DEPARTMENT OF THE INTERIOR. (Attachments: # 1 Exhibit Administrative Record Certification and Index)(Hadjigeorgiou, Claudia) (Entered: 10/10/2019) |
| 10/10/2019 | 24 | NOTICE of Appearance by Matthew Adams on behalf of YOCHA DEHE WINTUN NATION (Adams, Matthew) (Entered: 10/10/2019) |
| 10/23/2019 | 25 | NOTICE of Appearance by Paula M. Yost on behalf of YOCHA DEHE WINTUN NATION (Yost, Paula) (Entered: 10/23/2019) |
| 11/18/2019 | 26 | NOTICE OF WITHDRAWAL OF APPEARANCE as to YOCHA DEHE WINTUN NATION. Attorney Samuel E Kohn terminated. (Yost, Paula) (Entered: 11/18/2019) |

| 11/21/2019 | 27 | NOTICE of Change of Address by Matthew Adams (Adams, Matthew) (Entered: 11/21/2019) |
|---|---|---|
| 12/17/2019 | 28 | MOTION for Order *To Complete the Administrative Record* by SCOTTS VALLEY BAND OF POMO INDIANS (Attachments: # 1 Memorandum in Support, # 2 Declaration Arlinda F. Locklear, # 3 [Proposed] Order)(Bergin, Patrick) (Entered: 12/17/2019) |
| 12/18/2019 | 29 | NOTICE of Appearance by Devon Lehman McCune on behalf of DAVID BERNHARDT, TARA SWEENEY, JOHN TAHSUDA, UNITED STATES DEPARTMENT OF THE INTERIOR (McCune, Devon) (Entered: 12/18/2019) |
| 01/22/2020 | 30 | Memorandum in opposition to re 28 MOTION for Order *To Complete the Administrative Record* filed by DAVID BERNHARDT, TARA SWEENEY, JOHN TAHSUDA, UNITED STATES DEPARTMENT OF THE INTERIOR. (McCune, Devon) (Entered: 01/22/2020) |
| 02/06/2020 | 31 | REPLY to opposition to motion re 28 MOTION for Order *To Complete the Administrative Record* filed by SCOTTS VALLEY BAND OF POMO INDIANS. (Bergin, Patrick) (Entered: 02/06/2020) |
| 06/29/2020 | 32 | NOTICE *of Change of Firm Name* by SCOTTS VALLEY BAND OF POMO INDIANS (Bergin, Patrick) (Entered: 06/29/2020) |
| 06/30/2020 | | NOTICE OF ERROR re 32 Notice (Other); emailed to pbergin@ndnlaw.com, cc'd 17 associated attorneys –– The PDF file you docketed contained errors: 1. Name change must be made via Pacer (zjf, ) (Entered: 06/30/2020) |
| 09/28/2020 | 33 | MEMORANDUM OPINION & ORDER. Pursuant to Federal Rule of Civil Procedure 24 and for the reasons stated in the Memorandum Opinion & Order, Yocha Dehe's motion to intervene 17 is DENIED. However, in its discretion, the Court will permit Yocha Dehe to submit an amicus brief in support of defendants' dispositive motion when this case reaches that stage of the litigation. This is a final appealable Order. SO ORDERED. Signed by Judge Amy Berman Jackson on 9/28/2020. (lcabj3) (Entered: 09/28/2020) |
| 10/15/2020 | 34 | MEMORANDUM OPINION & ORDER denying plaintiff's 28 motion to complete the administrative record. See Order for details. SO ORDERED. Signed by Judge Amy Berman Jackson on 10/15/2020. (lcabj2) (Entered: 10/15/2020) |
| 10/15/2020 | | MINUTE ORDER. The parties shall confer and file a proposed schedule for briefing in this case by October 23, 2020. The parties' proposed briefing schedule should not anticipate the filing of simultaneous motions from each side; rather, it should propose dates for a dispositive motion, an opposition (and cross motion, if any, supported by a single memorandum), a reply (and cross–opposition, if any), and a cross–reply, if any. Dates contained in the report should be expressed as specific dates (month/day/year) rather than as time frames (e.g., "60 days after the entry of the scheduling order"). SO ORDERED. Signed by Judge Amy Berman Jackson on 10/15/2020. (lcabj2) (Entered: 10/15/2020) |
| 10/21/2020 | 35 | PROPOSED BRIEFING SCHEDULE by DAVID L. BERNHARDT, TARA SWEENEY, JOHN TAHSUDA, UNITED STATES DEPARTMENT OF THE INTERIOR. (Hadjigeorgiou, Claudia) (Entered: 10/21/2020) |
| 10/21/2020 | | MINUTE ORDER. In light of the proposed briefing schedule 35 , the Court ORDERS the plaintiff to file any motion for summary judgment by December 18, 2020; defendant's opposition (and cross motion, if any, to be supported by a single memorandum of points and authorities) by February 18, 2021; plaintiff's reply (and cross opposition, if any, supported by a single memorandum) by March 11, 2021; and defendant's cross reply (if any) by April 1, 2021. The Court ORDERS that any amicus brief by Yocha Dehe Wintun Nation must be filed by April 1, 2021. SO ORDERED. Signed by Judge Amy Berman Jackson on 10/21/2020. (lcabj2) (Entered: 10/21/2020) |

| 10/21/2020 | 36 | NOTICE of Appearance by Samantha R. Caravello on behalf of YOCHA DEHE WINTUN NATION (Caravello, Samantha) (Entered: 10/21/2020) |
| 10/21/2020 | 37 | MOTION for Reconsideration re 33 Memorandum & Opinion, by YOCHA DEHE WINTUN NATION (Attachments: # 1 Text of Proposed Order)(Caravello, Samantha) (Entered: 10/21/2020) |
| 10/21/2020 |  | Set/Reset Deadlines: Plaintiff's Motion for Summary Judgment due by 12/18/2020; Defendant's Opposition and Cross Motion, if any, due by 2/18/2021; Plaintiff's Reply and Cross Opposition, if any, due by 3/112021; and Defendant's Cross Reply, if any, due by 4/1/2021. Any Amicus Brief by Yocha Dehe Wintun Nation due by 4/1/2021. (jth) (Entered: 10/23/2020) |
| 11/03/2020 | 38 | Memorandum in opposition to re 37 MOTION for Reconsideration re 33 Memorandum & Opinion, filed by SCOTTS VALLEY BAND OF POMO INDIANS. (Attachments: # 1 Request for Judicial Notice, # 2 [Proposed] Order)(Bergin, Patrick) (Entered: 11/03/2020) |
| 11/10/2020 | 39 | REPLY to opposition to motion re 37 MOTION for Reconsideration re 33 Memorandum & Opinion, filed by YOCHA DEHE WINTUN NATION. (Caravello, Samantha) (Entered: 11/10/2020) |
| 12/04/2020 | 40 | MEMORANDUM OPINION & ORDER. Pursuant to Federal Rule of Civil Procedure 59 and for the reasons stated in the Memorandum Opinion & Order, Yocha Dehe's 37 motion for reconsideration is DENIED. Signed by Judge Amy Berman Jackson on 12/4/20. (lcabj2) (Entered: 12/04/2020) |
| 12/10/2020 | 41 | Joint MOTION for Extension of Time to *file for summary judgment* by DAVID L. BERNHARDT, TARA SWEENEY, JOHN TAHSUDA, UNITED STATES DEPARTMENT OF THE INTERIOR (Attachments: # 1 Text of Proposed Order)(Hadjigeorgiou, Claudia) (Entered: 12/10/2020) |
| 12/10/2020 |  | MINUTE ORDER granting the parties' joint 41 motion for extension of time. It is ORDERED that plaintiff's motion for summary judgment is due by January 29, 2021; defendants' opposition and cross motion, if any, to be supported by a single memorandum of points and authorities, is due by March 9, 2021; plaintiff's reply and cross opposition, if any, to be supported by a single memorandum, is due by April 1, 2021; and defendants' cross reply, if any, is due by April 22, 2021. Signed by Judge Amy Berman Jackson on 12/10/2020. (lcabj2) (Entered: 12/10/2020) |
| 12/10/2020 |  | MINUTE ORDER. In light of the 41 motion for extension of time, the Court ORDERS that any amicus brief by Yocha Dehe Wintun Nation must be filed by April 22, 2021. Signed by Judge Amy Berman Jackson on 12/10/20. (lcabj2) (Entered: 12/10/2020) |
| 12/21/2020 | 42 | MOTION to Stay *Proceedings Pending Appeal* by YOCHA DEHE WINTUN NATION (Attachments: # 1 Text of Proposed Order)(Caravello, Samantha) (Entered: 12/21/2020) |
| 12/29/2020 | 43 | Memorandum in opposition to re 42 MOTION to Stay *Proceedings Pending Appeal* filed by SCOTTS VALLEY BAND OF POMO INDIANS. (Attachments: # 1 Text of Proposed Order)(Bergin, Patrick) (Entered: 12/29/2020) |
| 01/04/2021 | 44 | REPLY to opposition to motion re 42 MOTION to Stay *Proceedings Pending Appeal* filed by YOCHA DEHE WINTUN NATION. (Caravello, Samantha) (Entered: 01/04/2021) |
| 01/11/2021 | 45 | ORDER. Yocha Dehe's 42 motion to stay proceedings pending appeal is DENIED. See Order for details. Signed by Judge Amy Berman Jackson on 1/11/21. (lcabj2) (Entered: 01/11/2021) |
| 01/12/2021 | 46 | NOTICE OF INTERLOCUTORY APPEAL as to 40 Order on Motion for Reconsideration, 33 Memorandum & Opinion, by YOCHA DEHE WINTUN NATION. Filing fee $ 505, receipt number ADCDC–8068723. Fee Status: Fee Paid. Parties have been notified. (Caravello, Samantha) (Entered: 01/12/2021) |
| 01/13/2021 | 47 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date re 46 Notice of Interlocutory Appeal. |

| | | |
|---|---|---|
| | | (zjf) (Entered: 01/13/2021) |
| 01/15/2021 | | USCA Case Number 21–5009 for 46 Notice of Interlocutory Appeal, filed by YOCHA DEHE WINTUN NATION. (zjf) (Entered: 01/25/2021) |
| 01/28/2021 | 48 | MOTION for Summary Judgment by SCOTTS VALLEY BAND OF POMO INDIANS. (Attachments: # 1 Memorandum in Support, # 2 Declaration Arlinda Locklear, # 3 Declaration Patrick R. Bergin, # 4 Exhibit 1, # 5 Exhibit 2, # 6 Exhibit 3, # 7 Exhibit 4, # 8 Exhibit 5, # 9 Exhibit 6, # 10 Exhibit 7, # 11 Exhibit 8, # 12 Exhibit 9, # 13 Text of Proposed Order)(Bergin, Patrick) (Entered: 01/28/2021) |
| 03/04/2021 | 49 | ORDER of USCA as to 46 Notice of Interlocutory Appeal, filed by YOCHA DEHE WINTUN NATION ; USCA Case Number: 21–5009. (zjf) (Entered: 03/07/2021) |
| 03/11/2021 | | MINUTE ORDER. In light of the D.C. Circuit's March 4, 2021 Order 49 , it is ORDERED that this case is STAYED pending Yocha Dehe's appeal. Signed by Judge Amy Berman Jackson on 3/11/21. (lcabj2) (Entered: 03/11/2021) |
| 04/01/2021 | 50 | NOTICE OF WITHDRAWAL OF APPEARANCE as to DAVID L. BERNHARDT, TARA SWEENEY, JOHN TAHSUDA, UNITED STATES DEPARTMENT OF THE INTERIOR. Attorney Claudia Antonacci Hadjigeorgiou terminated. (Hadjigeorgiou, Claudia) (Entered: 04/01/2021) |
| 07/13/2021 | | MINUTE ORDER. In light of the July 6, 2021 decision by the D.C. Circuit in Case No. 21–5009 affirming the Court's orders 33 40 denying Yocha Dehe Wintun Nation's motion to intervene, it is ORDERED that the stay pending appeal entered in this case on March 11, 2021, is hereby lifted, and that by July 20, 2021, the parties must propose a schedule for completing the summary judgment briefing in this case. The schedule should include dates for the filing of defendants' opposition to plaintiff's motion for summary judgment 48 and any cross motion, which must be supported by a single memorandum of points and authorities; plaintiff's reply and cross–opposition, if any, supported by one memorandum; and defendants' cross–reply if necessary. Any amicus submission by Yocha Dehe in support of the defense will be due three weeks after the filing of defendants' opposition. Signed by Judge Amy Berman Jackson on 7/13/21. (lcabj2) (Entered: 07/13/2021) |
| 07/20/2021 | 51 | PROPOSED BRIEFING SCHEDULE *(JOINT)* by SCOTTS VALLEY BAND OF POMO INDIANS. (Bergin, Patrick) (Entered: 07/20/2021) |
| 07/22/2021 | | MINUTE ORDER. In light of the parties' 51 proposed briefing schedule, it is ORDERED that defendants' opposition and cross motion, if any, to be supported by a single memorandum of points and authorities, is due by September 1, 2021; plaintiff's reply and cross opposition, if any, to be supported by a single memorandum, is due by September 30, 2021; and defendants' cross reply, if any, is due by October 21, 2021. Signed by Judge Amy Berman Jackson on 7/22/21. (lcabj2) (Entered: 07/22/2021) |
| 08/27/2021 | 52 | Unopposed MOTION for Extension of Time to *File Cross–Motion for Summary Judgment* by DEB HAALAND, UNITED STATES DEPARTMENT OF THE INTERIOR. (Attachments: # 1 Text of Proposed Order)(McCune, Devon) (Entered: 08/27/2021) |
| 08/30/2021 | | MINUTE ORDER granting federal defendants' unopposed 52 motion for extension of time. It is ORDERED that federal defendants' opposition and cross motion, if any, to be supported by a single memorandum of points and authorities, is due by October 1, 2021; plaintiff's reply and cross opposition, if any, to be supported by a single memorandum, is due by November 1, 2021; and federal defendants' cross reply, if any, is due by November 22, 2021. Signed by Judge Amy Berman Jackson on 8/30/21. (lcabj2) (Entered: 08/30/2021) |
| 09/01/2021 | 53 | MANDATE of USCA as to 46 Notice of Interlocutory Appeal, filed by YOCHA DEHE WINTUN NATION ; USCA Case Number 21–5009. (Attachments: # 1 USCA Judgment)(zjf) (Entered: 09/02/2021) |

| | | |
|---|---|---|
| 10/01/2021 | 54 | Cross MOTION for Summary Judgment by DEB HAALAND, BRYAN NEWLAND, UNITED STATES DEPARTMENT OF THE INTERIOR. (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Text of Proposed Order)(McCune, Devon) (Entered: 10/01/2021) |
| 10/01/2021 | 55 | Memorandum in opposition to re 48 MOTION for Summary Judgment *and in support of Cross−Motion for Summary Judgment* filed by DEB HAALAND, BRYAN NEWLAND, UNITED STATES DEPARTMENT OF THE INTERIOR. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(McCune, Devon) (Entered: 10/01/2021) |
| 10/22/2021 | 56 | AMICUS BRIEF *in Support of Federal Defendants* by YOCHA DEHE WINTUN NATION. (Attachments: # 1 Exhibit Attachment A, # 2 Exhibit Attachment B)(Adams, Matthew) (Entered: 10/22/2021) |
| 11/01/2021 | 57 | Memorandum in opposition to re 54 Cross MOTION for Summary Judgment filed by SCOTTS VALLEY BAND OF POMO INDIANS. (Bergin, Patrick) (Entered: 11/01/2021) |
| 11/01/2021 | 58 | REPLY to opposition to motion re 48 MOTION for Summary Judgment filed by SCOTTS VALLEY BAND OF POMO INDIANS. (Bergin, Patrick) Modified link on 11/2/2021 (znmw). (Entered: 11/01/2021) |
| 11/22/2021 | 59 | REPLY to opposition to motion re 54 Cross MOTION for Summary Judgment filed by DEB HAALAND, BRYAN NEWLAND, UNITED STATES DEPARTMENT OF THE INTERIOR. (McCune, Devon) (Entered: 11/22/2021) |
| 12/06/2021 | 60 | JOINT APPENDIX *OF PORTIONS OF THE ADMINISTRATIVE RECORD* by SCOTTS VALLEY BAND OF POMO INDIANS. (Attachments: # 1 Appendix)(Bergin, Patrick) (Entered: 12/06/2021) |
| 12/17/2021 | 61 | NOTICE *of Filing Appendix of Portions of Administrative Record Relied on in Amicus Brief* by YOCHA DEHE WINTUN NATION (Attachments: # 1 Appendix of Portions of the Administrative Record Relied on in Amicus Brief)(Adams, Matthew) (Entered: 12/17/2021) |
| 02/01/2022 | | MINUTE ORDER. It is ORDERED that a Video (VTC) Hearing on the parties Cross Motions 48 54 for Summary Judgment is set for 2/25/2022 at 10:00 AM before Judge Amy Berman Jackson. The Court's Deputy Clerk will provide counsel with the video connection information. Signed by Judge Amy Berman Jackson on 2/1/2022. (jth) (Entered: 02/01/2022) |
| 02/25/2022 | | Minute Entry for Proceedings held before Judge Amy Berman Jackson: Video (VTC) Motions Hearing held on 2/25/2022 re: Plaintiff's 48 Motion for Summary Judgment, and Defendants' 54 Cross Motion for Summary Judgment. The 48 54 Motions were Heard and Taken Under Advisement. (Court Reporter: Janice Dickman) (jth) (Entered: 02/25/2022) |
| 05/05/2022 | 62 | TRANSCRIPT OF PROCEEDINGS before Judge Amy Berman Jackson held on February 25, 2022; Page Numbers: 1−65. Date of Issuance: May 5, 2022. Court Reporter: Janice Dickman, Telephone number: 202−354−3267, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. |

| | | |
|---|---|---|
| | | Redaction Request due 5/26/2022. Redacted Transcript Deadline set for 6/5/2022. Release of Transcript Restriction set for 8/3/2022.(Dickman, Janice) (Entered: 05/05/2022) |
| 09/30/2022 | 63 | ORDER granting in part and denying in part plaintiff's 48 Motion for Summary Judgment, and granting in part and denying in part defendants' 54 Motion for Summary Judgment. See Order for details. Signed by Judge Amy Berman Jackson on 09/30/2022. (lcabj2) (Entered: 09/30/2022) |
| 09/30/2022 | 64 | MEMORANDUM OPINION. Signed by Judge Amy Berman Jackson on 09/30/2022. (lcabj2) (Entered: 09/30/2022) |
| 10/28/2022 | 65 | MOTION for Reconsideration re 64 Memorandum & Opinion, 63 Order on Motion for Summary Judgment,,, *under Rule 59(e)* by DEB HAALAND, BRYAN NEWLAND, JOHN TAHSUDA, UNITED STATES DEPARTMENT OF THE INTERIOR. (McCune, Devon) (Entered: 10/28/2022) |
| 11/10/2022 | 66 | Memorandum in opposition to re 65 Motion for Reconsideration filed by SCOTTS VALLEY BAND OF POMO INDIANS. (Attachments: # 1 Text of Proposed Order)(Bergin, Patrick) (Entered: 11/10/2022) |
| 11/11/2022 | 67 | Unopposed MOTION for Extension of Time to File Response/Reply as to 65 MOTION for Reconsideration re 64 Memorandum & Opinion, 63 Order on Motion for Summary Judgment,,, *under Rule 59(e)* by WIZIPAN GARRIOTT, DEB HAALAND, BRYAN NEWLAND, UNITED STATES DEPARTMENT OF THE INTERIOR. (Attachments: # 1 Text of Proposed Order)(McCune, Devon) (Entered: 11/11/2022) |
| 11/15/2022 | | MINUTE ORDER granting 67 Motion for Extension of Time to File Reply. Defendants must submit a reply in support of the 65 motion by November 21, 2022. SO ORDERED. Signed by Judge Amy Berman Jackson on 11/15/2022. (lcabj2) (Entered: 11/15/2022) |
| 11/21/2022 | 68 | REPLY to opposition to motion re 65 MOTION for Reconsideration re 64 Memorandum & Opinion, 63 Order on Motion for Summary Judgment,,, *under Rule 59(e)* filed by WIZIPAN GARRIOTT, DEB HAALAND, BRYAN NEWLAND, UNITED STATES DEPARTMENT OF THE INTERIOR. (McCune, Devon) (Entered: 11/21/2022) |
| 04/05/2023 | | MINUTE ORDER. A status conference is set for April 25, 2023 at 2:00 PM in Courtroom 3 before Judge Amy Berman Jackson. Counsel may notify the Court's Deputy Clerk if the hearing date poses a conflict. SO ORDERED. Signed by Judge Amy Berman Jackson on 04/05/2023. (lcabj2) (Entered: 04/05/2023) |
| 04/06/2023 | | MINUTE ORDER. At the request of counsel, and based on the availability of the Court's calendar, the status conference presently set for 4/25/2023 at 2:00 PM is RESET for 5/8/2023 at 2:00 PM in Courtroom 3 (In Person) before Judge Amy Berman Jackson. Signed by Judge Amy Berman Jackson on 4/6/2023. (jth) (Entered: 04/06/2023) |
| 05/08/2023 | | Minute Entry for Proceedings held before Judge Amy Berman Jackson. Status Conference held on 5/8/2023. For the reasons stated on the record in open Court, Defendants 65 Motion for Reconsideration is DENIED. (Court Reporter: Janice Dickman). (jth) (Entered: 05/08/2023) |
| 05/08/2023 | | MINUTE ORDER. For the reasons stated on the record during the hearing on May 8, 2023, defendants' 65 motion for reconsideration was DENIED. With respect to the question raised by the government at the close of the hearing, the Court has looked into the matter further. "It is well settled that, as a general rule, a district court order remanding a case to an agency for significant further proceedings is not final." Pueblo of Sandia v. Babbitt, 231 F.3d 878, 880 (D.C. Cir. 2000), quoting In re St. Charles Pres. Invs., Ltd., 916 F.2d 727, 729 (D.C. Cir. 1990). When "the district court's order comes within the category of a remand for significant further proceedings, [the Court of Appeals is] without jurisdiction to review it." Id. at 881; but see Sierra Club v. U.S. Dep't of Agric., 716 F.3d 653, 657 (D.C. Cir. 2013) ("The collateral order doctrine... is a practical construction of [28 U.S.C.] § 1291... that allows appeal of a small category of rulings that are conclusive, that resolve important questions separate from the merits, |

| | | and that are effectively unreviewable on appeal from the final judgment in the underlying action[.]") (internal citations and quotation marks omitted). If either party is seeking a ruling from this Court that any portion of the 63 September 30, 2022 Order granting in part and denying in part plaintiff's 48 Motion for Summary Judgment, and granting in part and denying in part defendants' 54 Motion for Summary Judgment, or today's Order, is appealable, it must supply the Court with authority that supports its position. SO ORDERED. Signed by Judge Amy Berman Jackson on 05/08/2023. (lcabj2) (Entered: 05/08/2023) |
|---|---|---|
| 05/23/2023 | 69 | TRANSCRIPT OF PROCEEDINGS before Judge Amy Berman Jackson held on May 8, 2023; Page Numbers: 1–36. Date of Issuance: May 23, 2023. Court Reporter: Janice Dickman, Telephone number: 202–354–3267, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 6/13/2023. Redacted Transcript Deadline set for 6/23/2023. Release of Transcript Restriction set for 8/21/2023.(Dickman, Janice) (Entered: 05/23/2023) |
| 07/07/2023 | 70 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to Order on Motion for Reconsideration, Status Conference by BRYAN NEWLAND, DEB HAALAND, UNITED STATES DEPARTMENT OF THE INTERIOR, WIZIPAN GARRIOTT. Fee Status: No Fee Paid. Parties have been notified. (McCune, Devon) (Entered: 07/07/2023) |
| 07/10/2023 | 71 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 70 Notice of Appeal to DC Circuit Court. (znmw) (Entered: 07/10/2023) |
| 07/14/2023 | | USCA Case Number 23–5162 for 70 Notice of Appeal to DC Circuit Court, filed by BRYAN NEWLAND, DEB HAALAND, UNITED STATES DEPARTMENT OF THE INTERIOR, WIZIPAN GARRIOTT. (znmw) (Entered: 07/14/2023) |
| 07/19/2023 | 72 | NOTICE OF APPEAL TO DC CIRCUIT COURT by SCOTTS VALLEY BAND OF POMO INDIANS. Filing fee $ 505, receipt number ADCDC–10217367. Fee Status: Fee Paid. Parties have been notified. (Bergin, Patrick) (Entered: 07/19/2023) |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SCOTTS VALLEY BAND OF POMO
INDIANS,

                Plaintiff,

v.

UNITED STATES DEPARTMENT OF THE           CASE NO. 1:19-cv-1544 ABJ
  INTERIOR, *et al.,*

              Defendants.

## NOTICE OF APPEAL

Unless the appeal noticed by the Defendants herein is dismissed, either voluntarily or upon the Plaintiff Scotts Valley Band of Pomo Indians' ("Tribe") Motion to Dismiss Defendants' Appeal for Lack of Jurisdiction, the Tribe hereby gives notice of its appeal to the United States Court of Appeals for the D.C. Circuit from the District Court's order, entered on September 30, 2022 (ECF No. 63) and Memorandum Opinion (ECF No. 64). The appeal presents the following grounds upon which the Tribe's motion for summary judgment was denied:

1. Defendants exceeded their authority under the Indian Gaming Regulatory Act, 25 U.S.C. §2701 *et seq.*, in the adoption of implementing regulations at 25 CFR Part 292.

2. Defendants violated the Indian Reorganization Act, 25 U.S.C. §5123(g) in the application of implementing regulations at 25 CFR Part 292 by treating the Tribe's Indian Lands Opinion ("ILO") request disparately compared to those made by restored tribes prior to the adoption of the regulations.

3. Defendants failed to faithfully apply their regulations at 25 CFR Part 292, and consider all evidence submitted by the Tribe regarding the Tribe's request for an ILO that a

specified parcel of land in the City of Vallejo, California, is eligible for tribal gaming if taken into trust by the United States for the Tribe.

4.   Defendant John Tahsuda, the signatory of the negative ILO on the Tribe's request, did not hold delegated authority to render the decision.

5.   Defendants' negative decision on the Tribe's ILO request was arbitrary and capricious for failing to comply with Defendants' own 2008 Guidance regarding the processing of such requests.

Dated this 19th day of July, 2023

Respectfully submitted,

By:      /s/ Patrick R. Bergin
Patrick R. Bergin (D.C. Bar No. 493585)
Tim Hennessy (D.C. Bar No CA00040)
PEEBLES KIDDER BERGIN & ROBINSON LLP
2020 L Street, Suite 250
Sacramento, California 95811
(916) 441-2700
pbergin@ndnlaw.com
thennessy@ndnlaw.com

Arlinda F. Locklear (D.C. Bar No. 962845)
4113 Jenifer Street, NW
Washington, DC 20015
(202) 237-0933
alocklearesq@verizon.net

Attorneys for Scotts Valley Band of Pomo Indians

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| SCOTTS VALLEY BAND OF ) | |
| POMO INDIANS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 19-1544 (ABJ) |
| ) | |
| UNITED STATES ) | |
| DEPARTMENT OF ) | |
| THE INTERIOR, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

### ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby **ORDERED** that plaintiff's motion for summary judgment is **GRANTED** with respect to the question of whether the February 7, 2019 Indian Lands Opinion ("ILO") was arbitrary and capricious when considered in accordance with the Indian canon of statutory construction, and **DENIED** with respect to whether Part 292, 25 C.F.R. § 292, violates the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*, or the Indian Reorganization Act, 25 U.S.C. § 5101 *et seq.*, and whether the agency's decision is a result of a flawed decision-making process.

Defendants' cross-motion for summary judgment is **GRANTED** with respect to the questions of whether the agency exceeded its statutory authority in issuing Part 292, whether it was lawful for the then-Principal Deputy to the Assistant Secretary, John Tahsuda, to issue the ILO, and whether the agency otherwise followed appropriate procedures, but is **DENIED** with respect to whether the ILO was arbitrary and capricious.

The Court, therefore, remands the ILO to the agency for further proceedings.

**SO ORDERED**.


AMY BERMAN JACKSON
United States District Judge

DATE:  September 30, 2022

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SCOTTS VALLEY BAND OF POMO INDIANS, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) | Civil Action No. 19-1544 (ABJ) |
| ) | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, ) ) ) ) | |
| Defendants. ) ) | |

## MEMORANDUM OPINION

On May 24, 2019, plaintiff, the Scotts Valley Band of Pomo Indians ("Scotts Valley"), brought this action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06, against the United States Department of the Interior ("Interior"); David L. Bernhardt, in his official capacity as Secretary of the Interior; Tara Sweeney, in her official capacity as Assistant Secretary for Indian Affairs; and John Tahsuda, in his official capacity as Principal Deputy to the Assistant for Indian Affairs.[1]  Compl. [Dkt. # 1].  Plaintiff challenged a February 7, 2019 Indian Lands Opinion ("ILO" or "Tahsuda letter") issued on behalf of the agency by the then-Principal Deputy to the Assistant Secretary, John Tahsuda, which found that a parcel of land in the City of Vallejo, California, would not qualify for gaming under what is known as the "restored lands" exception in the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.*  This decision rendered

---

[1]     In 2021, Deb Haaland, the Secretary of Interior, and Bryan Newland, the Secretary for Indian Affairs, were automatically substituted as defendants pursuant to Federal Rule of Civil Procedure 25(d).  Defendant John Tahsuda, no longer at the Department, was terminated as a defendant on August 27, 2021.

the land ineligible for gaming purposes under the IGRA and brought an end to Scotts Valley's efforts to acquire the land to establish a casino.

The parties have each filed a motion for summary judgment. Plaintiff argues that the agency's decision was arbitrary, capricious, and otherwise not in accordance with law in contravention of the APA, and it requests that the Court remand the ILO to the agency for reconsideration. Pl.'s Mot. for Summ. J. [Dkt. # 48], Mem. of P. & A. in Supp. of Pl.'s Mot. for Summ. J. [Dkt. # 48-1] ("Pl.'s Mot."). Defendants move for judgment in their favor on the grounds that the ILO is procedurally sound, the agency followed its implementing regulations in rendering the decision, and the regulations are based on permissible interpretations of the underlying statutes. Fed. Defs.' Cross-Mot. for Summ. J. [Dkt. # 54], Mem. in Supp. of Fed. Defs.' Cross-Mot. for Summ. J. and in Opp. to Pl.'s Mot. ("Defs.' Mot.").

For the reasons set forth below, the motions will each be granted in part and denied in part. The Court will enter judgment in favor of defendants on the issues of whether the then-Principal Deputy had the authority to issue the February 7, 2019 Indian Lands Opinion; whether the agency exceeded its authority under the IGRA when it promulgated Part 292, 25 C.F.R. § 292, interpreting the restored lands exception in the statute; and whether, for purposes of the APA, the agency examined the relevant data and set forth a reasoned basis for its decision in the ILO. However, even if one grants the agency's analysis due deference, the application of the well-settled Indian canon of statutory construction that the Court is also required to consider leads to the conclusion that the ILO cannot be sustained. The decision involves the application of an ambiguous term in a regulation promulgated to implement an ambiguous provision in a statute passed for the benefit of Native Americans. Resolving all inferences and doubts in favor of the Band, then, the Court finds that the ILO is arbitrary and capricious, does not give fair consideration to the historical

2

circumstances that severed the Band's connection to its land in the first place, and left the Band in a disadvantageous position compared to other tribes.  Therefore, the Court will enter judgment in favor of plaintiff on that issue and remand the ILO to the agency.

**STATUTORY AND REGULATORY FRAMEWORK**

Plaintiff argues, among other things, that the agency violated the APA because it exceeded its statutory authority under the Indian Gaming Regulatory Act  and the Indian Reorganization Act ("IRA"), 25 U.S.C. § 5101 *et seq.*, when it implemented a regulation to administer the IGRA known as Part 292.

## I.   Indian Gaming Regulatory Act

In 1988, Congress enacted the IGRA "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."  25 U.S.C. § 2702.  Under the IGRA, a tribe may conduct gaming activities only on eligible "Indian lands," *id.* § 2710(b)(1), (d)(1), defined to include "all lands within the limits of any Indian reservation" and "any lands title to which is . . . held in trust by the United States for the benefit of any Indian tribe."  *Id.* § 2703(4)(A–B).  However, the IGRA prohibits gaming "on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988," unless the land falls into one of several enumerated exceptions.  *Id.* § 2719(a).  The statutory exception at issue in this case is referred to as the "restored lands" exception; it permits gaming on "lands . . . taken into trust as part of . . . the restoration of lands for an Indian tribe that is restored to Federal recognition."  *Id.* § 2719(b)(1)(B)(iii); *see City of Roseville v. Norton*, 348 F.3d 1020, 1024 (D.C. Cir. 2003) (describing IGRA exceptions); 25 C.F.R. § 292.7 (denoting 25 U.S.C. § 2719(b)(1)(B)(iii) as the "restored lands" exception).  This exception "helps ensure 'that tribes lacking reservations when [the IGRA] was enacted are not disadvantaged

3

relative to more established ones.'"  *Butte County v. Chaudhuri*, 887 F.3d 501, 503 (D.C. Cir. 2018), quoting *City of Roseville*, 348 F.3d at 1030.  While the IGRA predicates an important exception to the prohibition on gaming on "the restoration of lands," it does not go on to define the term.  *See City of Roseville*, 348 F.3d at 1024.

## II.    Part 292

In 2008, the Department of Interior, which administers the IGRA through the Bureau of Indian Affairs ("BIA"), promulgated a set of regulations, found at 25 C.F.R. § 292 ("Part 292"), to "implement section 2719 of IGRA by articulating standards that the Department will follow in interpreting the various exceptions to the gaming prohibition on after-acquired trust lands contained in section 2719 of IGRA."   Final Rule, Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed. Reg. 29354 (May 20, 2008) ("Final Rule").

Part 292 sets out four criteria that must be satisfied to invoke the restored lands exception. First, the tribe must have once been federally recognized.  25 C.F.R. § 292.7(a).  Second, the tribe must have later "lost its government-to-government relationship," which can be shown by pointing to "[l]egislative termination," "[c]onsistent historical written documentation from the Federal Government effectively stating it no longer recognized a government-to-government relationship with the tribe," or "[c]ongressional restoration legislation that recognize[d] the existence of the previous government-to-government relationship."  *Id.* §§ 292.7(b), 292.9.  Third, the tribe must have been "restored to Federal recognition."  *Id.* § 292.7(c).  Fourth, and at issue here, "[t]he newly acquired lands [must] meet the criteria of 'restored lands' in § 292.11."  *Id.* § 292.7(d).  This requirement concerns the tribe's relationship to the land itself.

If a tribe has been restored pursuant to an act of Congress that also specifies the land that will accompany the restoration, that land automatically qualifies as "restored lands."

4

*Id.* § 292.11(a)(1).  However, if no land is set aside by legislation or if the tribe is restored other

than through an act of Congress, additional requirements must be met for the land to qualify as

"restored lands."  *See id.* § 292.11(a)(2).  First, the tribe must demonstrate that the land is "located

within the State . . . where the tribe is now located" and that it has a "modern connection[]" to the

land.  *Id.* § 292.12(a).[2]  Second, the "tribe must demonstrate a significant historical connection to

the land."  *Id.* § 292.12(b).  This is defined in the regulation to mean that "the land is located within

the boundaries of the tribe's last reservation under a ratified or unratified treaty, or a tribe can

demonstrate by historical documentation the existence of the tribe's villages, burial grounds,

occupancy or subsistence use in the vicinity of the land."  25 C.F.R. § 292.2.  And finally, the

"tribe must demonstrate a temporal connection between the date of the acquisition of the land" and

the date when the tribe was federally restored.  *Id.* § 292.12(c).

### III.    Indian Reorganization Act

In 1934, Congress enacted the IRA with the "overriding purpose . . . to establish machinery

whereby Indian tribes would be able to assume a greater degree of self-government, both

politically and economically."  *Morton v. Mancari*, 417 U.S. 535, 542 (1974).  Section 5 of the

---

2       "[T]he tribe must demonstrate one or more of the following modern connections to the
land:

> (1) The land is within reasonable commuting distance of the tribe's existing
> reservation;
>
> (2) If the tribe has no reservation, the land is near where a significant number
> of tribal members reside;
>
> (3) The land is within a 25–mile radius of the tribe's headquarters or other tribal
> governmental facilities that have existed at that location for at least 2 years
> at the time of the application for land-into-trust; or
>
> (4) Other factors demonstrate the tribe's current connection to the land."

25 C.F.R. § 292.12(a)(1)–(4).

5

IRA authorizes the Secretary of the Interior to "acquire . . . any interest in lands . . . including trust or otherwise restricted allotments . . . for the purpose of providing land for Indians." 25 U.S.C. § 5108.  Lands taken into trust for an Indian tribe under that provision may be designated as part of the tribe's reservation.  *Id.* § 5110.

In addition to authorizing the Secretary to acquire lands in trust, the IRA granted federally recognized tribes certain privileges and immunities.  Of note here, it prohibits the federal government from "promulgat[ing] any regulation or mak[ing] any decision or determination . . . with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes."  *Id.* § 5123(g).

## FACTUAL BACKGROUND

As the lengthy administrative record in this case reflects, the documented history of the Scotts Valley Band of Pomo Indians stretches back to at least the 1800s.  Scotts Valley is the modern day successor of the Mo-al-kai (also known as "Moalkai," "Yimaba," and "Yimabak") and Ca-la-na-po (also known as the "Kulanapo" and "Hoolanapo") bands of Pomo Indians.  J.A. of Portions of the Admin. R. [Dkt. # 60-1] ("Admin. R.")[3] at AR0000002, AR0006687; *see* ILO at 4, Admin. R. at AR0011600.[4]  Each of these bands was a signatory to the August 20, 1851 Treaty of Camp Lu-pi-yu-ma with the United States, in which the tribes agreed to cede aboriginal

---

[3]     All citations to the February 7, 2019 ILO, which was submitted to the Court as part of the administrative record, will contain a citation to the internal page number of the ILO, as well as a citation to the administrative record.  All other documents contained within the administrative record will only be cited to where they appear in the administrative record.

[4]     The Band also asserts it is the modern day successor of the Habenepo Band of Pomo Indians (also known as the "Ha-bi-na-po").  *See* Admin. R. at AR0000002, AR0000019.  Interior disputed this connection in the ILO, saying that "the evidence is insufficient to establish such a finding," but "whether or not the connection exists is not dispositive in this restored lands determination."  ILO at 5 n.27, Admin. R. at AR0011601.

6

lands in exchange for the establishment of a reservation by the United States.  Admin. R. at AR0000002, AR0004468.  The Senate never ratified that treaty, though, and no land was otherwise reserved for the tribe.  Admin. R. at AR0000002, AR0004468.

In 1911, the United States acquired a parcel of land for Scotts Valley known as the Sugar Bowl Rancheria.  Admin. R. at AR0000002–03; ILO at 6, Admin. R. at AR0011602.  Scotts Valley continued to hold that land until 1958, when Congress enacted the California Rancheria Termination Act, Pub. L. No. 85–671, 72 Stat. 619 (1958), which terminated both the federal trust relationship with the tribe as well as the reservation status of the Sugar Bowl Rancheria.  *See* ILO at 3, Admin. R. at AR0011599; Admin. R. at AR0010735.  In 1986, Scotts Valley and other California Indian tribes filed a class action lawsuit against the United States, alleging that the Government had unlawfully terminated their trust status twenty-eight years before.  *See* ILO at 3, Admin. R. at AR0011599; *Scotts Valley Band of Pomo Indians of Sugar Bowl Rancheria v. United States*, 921 F.2d 924 (9th Cir. 1990).  As part of the settlement of that litigation, the United States reinstated Scotts Valley's status as a federally recognized tribe, which became effective on September 5, 1991.  *See* Admin. R. at AR0000011; ILO at 3, Admin. R. at AR0011599; *see also* Notice of Reinstatement to Former Status for the Guidiville Band of Pomo Indians, the Scotts Valley Band of Pomo Indians and Lytton Indian Community of CA, 57 Fed. Reg. 5214 (Feb. 12, 1992) ("Notice of Reinstatement").  But that act was not accompanied by the identification of any land for the tribe.  *See* Notice of Reinstatement.

In 2005, before Part 292 had been promulgated, Scotts Valley submitted a request to Interior to acquire lands in trust for gaming.  Admin. R. at AR0006387.  The agency concluded that the tribe did not establish a "significant historical connection" to the land it sought to acquire

7

at that time – the Richmond Parcels – and the tribe did not challenge the decision.  Admin. R. at AR0006403.

Approximately ten years later, the Band initiated steps to acquire another parcel.  *See* Admin. R. at AR0000001.  It requested, pursuant to 25 C.F.R. § 151.9, that the Department acquire 128.32 acres of land in the City of Vallejo, in Solano County, California, referred to as the Vallejo Parcel, into trust on its behalf.[5]  *See* ILO at 1, Admin. R. at AR0011597; *see also* Admin. R. at AR0004414, AR0006684.  In connection with that effort, on January 28, 2016, Scotts Valley submitted a request for an Indian Lands Opinion, or "restored lands" determination.  Admin. R. at AR0000001.  Therefore, the then-Principal Deputy Assistant Secretary, John Tahsuda, undertook to determine whether the Parcel, if taken into trust, would qualify as "restored lands" for purposes of the exception to the general prohibition on gaming on lands acquired after 1988.  ILO at 1, Admin. R. at AR0011597.

The tribe's request was supported with several attachments, including a legal analysis, expert reports about the anthropological and historical ties the tribe had to the land, and a declaration from the tribe's Secretary, Patricia Franklin.  Admin. R. at AR0000004.  The tribe supplemented its ILO request in December 2017, Admin. R. at AR0010720–81, and on May 3, 2018.  Admin. R. at AR0004411–12.

On February 7, 2019, Tahsuda issued a decision on behalf of the agency:  "I regret to inform you that the Department has determined that the Parcel does not qualify as restored lands within

---

5       *See* Scotts Valley Band of Pomo Indians Fee-to-Trust Application (Aug. 2016), Admin. R. at AR0006681–719 ("The Scotts Valley Band of Pomo Indians . . . is requesting that the Secretary of the Interior accept trust title to a 128-acre parcel of land in the City of Vallejo for the benefit of the Tribe."); *see* Letter from Gabriel Ray, Chairman, to Amy Dutschke, Reg'l Dir., Pac. Reg'l Off., Bureau of Indian Affs., U.S. Dep't of the Interior (Aug. 11, 2016), Admin. R. at AR0004461 (letter to which fee-to-trust application was attached); *see also* Admin. R. at AR0010720–81 (December 2017 supplement to fee-to-trust application).

the meaning of applicable law."  ILO at 2, Admin. R. at AR0011598.  The decision was based on

a determination that "the [Scotts Valley] Band . . . failed to provide sufficient evidence of a

'significant historical connection' to the [Vallejo] Parcel, as required to qualify this particular

property for the restored lands exception."  ILO at 2, Admin. R. at AR0011598.  Although Scotts

Valley "met the [first] requirement of the two-part restored lands exception analysis," because it

was a restored tribe, and also "demonstrated the required modern and temporal connections to the

Parcel," ILO at 3, Admin. R. at AR0011599, the agency concluded that the Band had not shown

evidence of a "significant historical connection" as required by Part 292 because:   (1) "[t]he

Vallejo Parcel is not located within the boundaries of the Band's last reservation under a ratified

or unratified treaty," ILO at 5, Admin. R. at AR0011601; (2) "[t]he Vallejo Parcel is not proximate

to the boundaries of the Band's last reservation under a ratified or unratified treaty," which could

help establish the necessary connection to the Parcel, ILO at 6, Admin. R. at AR0011602; and (3)

"[t]he Band has not demonstrated the existence of the Band's villages, burial grounds, occupancy

or subsistence use in the vicinity of the Parcel," ILO at 7, Admin. R. at AR0011603.

       With respect to the third method of establishing a historical connection – the "Band's

villages, burial grounds, occupancy or subsistence use in the vicinity of the Parcel" – first, the ILO

rejected Scotts Valley's contention that its ancestors' cession of land pursuant to the 1851 Treaty

was sufficient to establish a significant historical connection to the Vallejo Parcel "per se" since

the ceded land (dubbed "Area 296") encompassed the Parcel.  ILO at 7–10, Admin. R. at

AR0011603–06.  Although Interior acknowledged that the Vallejo Parcel's location within

Area 296 created a "favorable inference" for the tribe, it took the position that the Band "must still

demonstrate additional historical connection."  ILO at 10, Admin. R. at AR0011606.  Second,

Interior decided that the Vallejo Parcel's designation as a pick-up site for supplies delivered by

9

federal officials in 1851 to 1853 was insufficient to demonstrate occupancy or subsistence use in the vicinity of the Parcel.  ILO at 10, Admin. R. at AR0011606.  It noted that the arrangement lasted for only three years and that the location had been designated as the pick-up spot because it was "convenient for federal officials who were reluctant to deliver provisions to the Clear Lake bands in the mountainous territory where they lived."  ILO at 11–12, Admin. R. at AR0011607– 08.  Third, Interior reviewed Scotts Valley's submissions about an individual identified as Chief Augustine who worked in the North Bay region during the mid-1800s, to whom many in the tribe trace their ancestry.  ILO at 12, Admin. R. at AR0011608.  Although the tribe maintained that Chief Augustine's activities were representative of its other ancestors and showed occupancy and subsistence use in the vicinity of the Vallejo Parcel, Interior concluded that "it would be erroneous to attribute the connections made by a specific tribal member like Augustine, or a handful of members, to the entire Band, or to its predecessors."  ILO at 16, Admin. R. at AR0011612.  It also found that "even assuming that Augustine's living and labor patterns are representative of those of the Band's ancestors, such patterns do not constitute occupancy or subsistence use."  ILO at 17, Admin. R. at AR0011613.

For all of those reasons, Interior declined to take the Vallejo Parcel in trust for gaming purposes, finding that the Parcel did "not meet the regulatory requirements necessary to qualify for the restored lands exception under IGRA."  ILO at 19, Admin. R. at AR0011615.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  However, in cases involving review of final agency action under the APA, Rule 56 does not apply due to "the limited role of a court in reviewing the

administrative record." *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 21 (D.D.C. 2011).  Under the APA, the agency's role is to resolve factual issues and arrive at a decision that is supported by the administrative record, and the court's role is to "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985), citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *see also Richards v. INS*, 554 F.2d 1173, 1177, 1177 n.28 (D.C. Cir. 1977).

Further, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), in excess of statutory authority, *id.* § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D).  However, the scope of review under the APA is narrow.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The agency's decision is generally presumed to be valid, *see Citizens to Preserve Overton Park*, 401 U.S. at 415, and the court must not "substitute its judgment for that of the agency."  *State Farm*, 463 U.S. at 43.  A court must be satisfied, though, that the agency has examined the relevant data and articulated a satisfactory explanation for its action, "including a rational connection between the facts found and the choice made." *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) (citations and internal quotation marks omitted).

## ANALYSIS

I.  **The Department did not act outside of its statutory authority by requiring tribes to demonstrate a "significant historical connection" for purposes of the restored lands exception.**

### A.  The *Chevron* framework.

Ordinarily, a court reviewing an agency's interpretation of a statute must employ the two-step analysis outlined in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).   Step one involves determining whether Congress has spoken directly to the precise question at issue.  *Id.* at 842.  The D.C. Circuit has explained:

> Under the first step of *Chevron*, the reviewing court "must first exhaust the traditional tools of statutory construction to determine whether Congress has spoken to the precise question at issue."  The traditional tools include examination of the statute's text, legislative history, and structure, as well as its purpose.

*Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997) (internal citations omitted), quoting *Nat. Res. Def. Council v. Browner*, 57 F.3d 1122, 1125 (D.C. Cir. 1995).

The court is required to utilize these methods to determine whether Congress has "unambiguously foreclosed the agency's statutory interpretation."  *Catawba County v. EPA*, 571 F.3d 20, 35 (D.C. Cir. 2009).

> Congress may have done so in one of two ways:  either by prescribing a precise course of conduct other than the one chosen by the agency, or by granting the agency a range of interpretive discretion that the agency has clearly exceeded. . . . And if the agency has either violated Congress's precise instructions or exceeded the statute's clear boundaries then, as *Chevron* puts it, "that is the end of the matter" – the agency's interpretation is unlawful.

*Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 659–60 (D.C. Cir. 2011), citing *Chevron*, 467 U.S. at 842; *see Chevron*, 467 U.S. at 842–43 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

The burden is on the plaintiff challenging an agency interpretation to "do more than offer a reasonable or, even the best, interpretation" of the statute; the plaintiff must instead show "that the statute *unambiguously* forecloses the [agency's] interpretation." *Vill. of Barrington*, 636 F.3d at 661 (emphasis in original).  In other words, if a court determines "that statutory ambiguity has left the agency with a range of possibilities and that the agency's interpretation falls *within* that range, then the agency will have survived *Chevron* step one." *Id.* at 660 (emphasis in original).

If the statute is silent or ambiguous on the question, *Chevron* instructs the court to go on to a second step and determine "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.  Once a reviewing court reaches the second step, it must accord "considerable weight" to an executive agency's construction of a statutory scheme it has been "entrusted to administer." *Id.* at 844.  Indeed, "under *Chevron*, courts are bound to uphold an agency interpretation as long as it is reasonable—regardless [of] whether there may be other reasonable or, even more reasonable, views." *Serono Lab'ys, Inc. v. Shalala*, 158 F.3d 1313, 1321 (D.C. Cir. 1998).  "In making this assessment, [the court] look[s] to what the agency said at the time of the rulemaking—not to its lawyers' post-hoc rationalizations." *Council for Urological Ints. v. Burwell*, 790 F.3d 212, 222 (D.C. Cir. 2015).  The Supreme Court explained:

> If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation.  Such legislative regulations are given controlling weight unless they are arbitrary, capricious or manifestly contrary to the statute.  Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit.  In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

*Chevron*, 467 U.S. at 843–44.  In either event, then, the fundamental inquiry at the first level of the *Chevron* analysis is to ascertain whether Congress has authorized the agency to make rules to fill in a gap.

13

**B.  The Indian canon of construction.**

As plaintiff points out, though, *Chevron* is not the beginning and end of the analysis in this case.  *See* Pl.'s Mot. at 23–24.  The Supreme Court has also instructed that "the standard principles of statutory construction do not have their usual force in cases involving Indian law[;] . . . statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."  *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985).  This canon of construction is "rooted in the unique trust relationship between the United States and the Indians." *Id.*, quoting *Oneida County v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985).  The Court later reiterated the point:

> When we are faced with these two possible constructions, our choice between them must be dictated by a principle deeply rooted in this Court's Indian jurisprudence:  "[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."

*County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation*, 502 U.S. 251, 269 (1992), quoting *Blackfeet Tribe*, 471 U.S. at 766.

The D.C. Circuit's guidance on how the Indian canon should bear on the level of deference to be accorded to an agency's determination has evolved over time.  In *Moscogee (Creek) Nation v. Hodel* (*Creek*), 851 F.2d 1439 (D.C. Cir. 1988), the Creek Nation challenged a decision by the BIA denying its request for funds to establish a Tribal court and law enforcement program pursuant to the Oklahoma Indian Welfare Act ("OIWA"), 25 U.S.C. § 501 *et seq.*  The government argued that its ruling was supported by sound principles of statutory construction since the OIWA did not expressly repeal provisions in prior legislation abolishing the Tribal courts.  *Creek*, 851 F.2d at 1442.  The Court of Appeals rejected that argument, explaining:

> "[Interior] fails to appreciate, however, that the standard principles of statutory construction do not have their usual force in cases involving Indian law." . . . If there is any ambiguity as to the inconsistency and/or the repeal

14

> of the Curtis Act, the OIWA *must* be construed in favor of the Indians, i.e.,
> as repealing the Curtis Act and permitting the establishment of Tribal
> Courts. The result, then, is that if the OIWA can reasonably be construed
> as the Tribe would have it construed, it *must* be construed that way.

*Id.* at 1444–45, quoting *Blackfeet Tribe*, 471 U.S. at 766 (emphasis in original); *see also Creek*,

851 F.2d at 1445 n.8 ("It is for this reason that, while we have given careful consideration to

Interior's interpretation of the OIWA, we do not defer to it.").

In 2001, the Circuit elaborated on the reasons behind the canon:

> This departure from the *Chevron* norm arises from the fact that the rule of
> liberally construing statutes to the benefit of the Indians arises not from the
> ordinary exegesis, but "from principles of equitable obligations and
> normative rules of behavior," applicable to the trust relationship between
> the United States and the Native American people.

*Cobell v. Norton* (*Cobell VI*), 240 F.3d 1081, 1101 (D.C. Cir. 2001), quoting *Albuquerque Indian*

*Rights v. Lujan*, 930 F.2d 49, 59 (D.C. Cir. 1991).

In *City of Roseville*, the agency did not rely on deference on appeal, and the Court did not

specifically address whether the canon would take precedence over *Chevron*. 348 F.3d. at 1020.

But the Court did reiterate that if there were any doubt as to how the IGRA provision at issue

should be interpreted, the Indian canon of statutory construction would resolve it. *Id.* at 1032. The

Circuit declared that the canon's "applicability to ambiguous statutes purporting to benefit Indians

is settled," and it again characterized the canon in mandatory terms:

> IGRA is designed to promote the economic viability of Indian Tribes, and
> [the Auburn Indian Restoration Act] focuses on ensuring the same for the
> Auburn Tribe. In this context, the Indian canon requires the court to resolve
> any doubt in favor of the tribe.

15

*Id.*[6]

The Court of Appeals used somewhat different language with respect to the Indian canon in *Cobell v. Salazar* (*Cobell XXII*), 573 F.3d 808 (D.C. Cir 2009), one of the many opinions generated during the course of the thirteen years of litigation over the agency's handling of Indian trust accounts.  The particular factual context of the litigation had implications for the legal rubric to be applied; as the Court had noted earlier in *Cobell v. Kempthorne* (*Cobell XVII*), 455 F.3d 301, 303–04 (D.C. Cir. 2006), because "both the APA and the common law of trust apply in this case[,] the specific question to be addressed would determine which body of law becomes most prominent" in any given situation.  The issue in *Cobell XXII* was how the agency was to go about conducting the long-overdue accounting that had previously been ordered as equitable relief, and the opinion dealt primarily with the interplay between legal principles and common law trust principles governing trusteeships.  However, the Court did provide some guidance on the Indian canon issue as well:

> We recognize, as did the district court, that the courts face two mandates of deference in construing the relevant statutes at issue in this case.  First, there is the familiar *Chevron* deference upon which the district court relied in reviewing Interior's methodology.  However, as the court observed, *Chevron* deference can be "'trumped by the requirement that statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'"  [*Cobell v. Kempthorne*, 532 F. Supp 2d. 37, 89] (quoting *Cobell XVIII*, 455 F.3d at 304, and collecting other citations).  Nonetheless, *Chevron* deference does not disappear from the process of reviewing an agency's interpretation of those statutes it is trusted to administer for the benefit of the Indians, although that deference applies with muted effect.  Granted, the Indians' benefit remains paramount.  But where Congress has entrusted to the agency the duty of applying, and

---

6       The Court noted that its discussion of the standard to be applied was limited to the narrow question before it – the treatment of land that had been restored by statute under the restored lands exception.  "To the extent that the Secretary's interpretation of the 'restoration of lands' provision may include nuances regarding its application to Indian lands not acquired pursuant to a restoration act, the court has no occasion to reach the issue of deference to her interpretation in such circumstances."  *City of Roseville*, 348 F.3d at 1025.

16

therefore interpreting, a statutory duty owed to the Indians, we cannot ignore the responsibility of the agency for careful stewardship of limited government resources.  Applying even a muted *Chevron* deference leads us to a different conclusion than that reached by the district court.

*Cobell XXII*, 573 F.3d at 812.

To the extent the Circuit backed away from the notion that the Indian canon could "trump" *Chevron* deference, it did so in the *sui generis* context of the *Cobell* litigation.  Since the expenditure of government resources has not been raised by the government as a factor to be considered in the interpretation of the restored lands provision under the IGRA, it is not entirely clear whether the Circuit would be of the view that *Chevron* deference plays a role in all cases involving Indian affairs – including this one – but "with muted effect," or that the canon would outweigh *Chevron* deference here because a statute passed for the benefit of Indian tribes is under scrutiny.  In either event, it is clear, at least, that the Court must both construe the statute "liberally in favor of the Indians," *Cobell VI*, 240 F.3d at 1101, and give the agency's view "careful consideration."  *Creek*, 851 F.2d at 1445 n.8; *see also Confederated Tribes of Grand Ronde Cmty. of Or. v. Jewell*, 830 F.3d 552, 558 (2016), quoting *Cal. Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1266 n.7 (D.C. Cir. 2008) ("When it comes to an agency's interpretation of a statute Congress has authorized it to implement, we employ the familiar *Chevron* analysis. . . . We do so while mindful of the 'governing canon of construction requir[ing] that statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'").

The agency takes the position, though, that *Chevron* alone provides the governing standard, and that the Court "must" defer to the agency's interpretation.  *See* Defs.' Mot. at 11, citing *Rancheria v. Jewell*, 776 F.3d 706, 712 (9th Cir. 2015) and *Citizens Exposing Truth about Casinos v. Kempthorne* (*CETAC*), 492 F.3d 460, 465 (D.C. Cir. 2007).  But this Court is not bound by out-of-circuit authority, particularly when it is contrary to the binding precedent here.  *See Rancheria*

17

*v. Jewell*, 776 F.3d at 713 (explaining that Tribe's argument that the court must apply the Indian canon of construction instead of the government's interpretation was "foreclosed by precedent in this Circuit.  This court has repeatedly 'declined to apply [the Indian law canon of construction] in light of competing deference given to an agency charged with the statute's interpretation.'") (brackets in original) (internal citations omitted).

Moreover, *CETAC* did not purport to mark a change in the law in the D.C. Circuit, and it does not stand for the proposition that *Chevron* deference necessarily controls.  In *CETAC*, a non-profit group opposed to gambling challenged Interior's decision to take land into trust for the Nottawaseppi Huron Band of Potawatomi Indians.  In that circumstance, the Court found the agency's interpretation of the statute to be permissible under *Chevron*, but it also took note of the requirement under the Indian canon to resolve any doubt in favor of the Band.  *CETAC*, 492 F.3d at 471 ("[B]ecause the Secretary's interpretation of IGRA's 'initial reservation' exception is due deference under *Chevron* and is a permissible interpretation that is consistent with the Indian canon of statutory construction, we affirm the grant of summary judgment to the Secretary.").  Since the decision under review in *CETAC* did not conflict with the interests of an Indian tribe, the decision did not establish a precedent for how to proceed in the instant case.  Similarly, while defendants point to *Oregon v. Norton*, 271 F. Supp. 2d 1270 (D. Or. 2003), in that case, the court merely applied the canon alongside *Chevron* deference since the plaintiffs were third parties challenging the agency's determination in favor of a tribe that a parcel qualified for gaming under the restored lands exception.  *See id.* at 1275 (after laying out the *Chevron* two-part analysis, the

court observed, "[i]n reviewing an agency's interpretation of a statute governing Indian tribes, the court must also consider canons of construction relevant to Indian law").[7]

For those reasons, then, the Court is legally bound to apply the Indian canon of construction to the task before it.

### C. *Chevron* Step One:  The statute is ambiguous and does not foreclose the agency's interpretation.[8]

#### 1.  The text of the provision.

Scotts Valley argues that the agency exceeded its statutory authority under the IGRA when it promulgated regulations requiring that a tribe show a "significant historical connection" to a

---

[7]     In *California Valley Miwok Tribe v. United States*, 515 F.3d 1262 (D.C. Cir. 2008), the Court of Appeals accorded *Chevron* deference, but also in a unique, distinguishable situation.  The case involved an effort by "a small cluster of people" within the Tribe to organize a tribal government; it adopted a constitution "without so much as consulting its membership," and the Secretary refused to approve it "because it was not ratified by anything close to a majority of the tribe." *Id.* at 1263.  The Court upheld the agency's ruling for a host of reasons, but it also observed:

> We recognize that we typically do not apply full *Chevron* deference to an agency interpretation of an ambiguous statutory provision governing Indian affairs. . . . Here, however, the Secretary's proposed interpretation does not run against any Indian tribe; it runs only against one of the contestants in a heated tribal leadership dispute . . . . Therefore, adherence to *Chevron* is consistent with the customary Indian-law canon of construction.

*Id.* at 1255 n.7; *see Koi Nation of Northern California v. Dep't of Interior*, 361 F. Supp. 3d 14, 49–50 (D.D.C. 2019), citing *Cal. Valley Miwok Tribe*, 515 F.3d at 1266 n.7 (commenting that *CETAC* and *Oregon v. Norton* "stand for the proposition that the Indian canon of construction is not substituted for *Chevron* deference when the Secretary's proposed interpretation does not run against any Indian tribe . . . [and] actually advances the trust relationship between the United States and the Native American people.") (brackets in original) (internal quotation marks omitted).

[8]     *See Sault Ste. Marie Tribe of Chippewa Indians v. Haaland*, 25 F.4th 12, 21 n.7 (D.C. Cir. 2022) ("Because we find no ambiguity in the Michigan Act, we reach neither Interior's claim for *Chevron* deference nor the Tribe's argument that the Indian canon requires an interpretation in its favor."); *see also Koi Nation*, 361 F. Supp. 3d at 42 ("Regardless of whether *Chevron* deference or the Indian canon of construction applies, the law is well-settled that under *Chevron*, a court must first determine whether Congress has directly addressed the precise question at issue, before assessing whether the agency's interpretation of a statute was reasonable.") (internal quotation marks omitted).

parcel for the land to be considered "restored lands."  Pl.'s Mot. at 20.  Defendants maintain that "the Court must defer to the Interior's reasonable interpretation of IGRA," and that as a threshold matter, "IGRA's reference to 'restoration of lands' . . . is ambiguous," and therefore "subject to interpretation by Interior through regulation."  Defs.' Mot. at 11–12.

As explained above, there is an exception to the prohibition on gaming on Indian land if the land was taken into trust as part of the "restoration of lands" for an Indian tribe. 25 U.S.C. § 2719(b)(1)(B)(iii).  However, as the parties agree, "[t]he IGRA does not define a 'restoration of lands.'"  *City of Roseville*, 348 F.3d at 1024; *see Grand Traverse Band of Ottawa & Chippewa Indians v. U.S. Att'y for W. Dist. of Mich.* (*Grand Traverse II*), 198 F. Supp. 2d 920, 928 (W.D. Mich. 2002), *aff'd sub nom. Grand Traverse Band of Ottawa & Chippewa Indians v. U.S. Atty. for W. Div. of Mich.* (*Grand Traverse Appeal*), 369 F.3d 960 (6th Cir. 2004) ("Neither 'restored' nor 'restoration' is defined under § 2719(b)(1)(B)(iii)."); *Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt*, 116 F. Supp. 2d 155, 161 (D.D.C. 2000) ("'Restoration' is not defined in the statute."); *Babbitt*, 116 F. Supp. 2d at 162 ("The varying [interpretive] possibilities highlight the ambiguity of section 2719(b)(1)(B)(iii)."); *see also* Pl.'s Mot. at 17 ("IGRA does not define restored tribe or restored lands.").

The parties disagree, though, as to whether "restoration of lands" has a plain meaning that allows for no further interpretation.  The Band insists that it does:  "[t]he ordinary meaning of the operative word 'restore' or 'restoration' is to put back into a former or proper position as a tribe with a land base."  Pl.'s Mot. at 21.  It observes that "[o]n its face, this term does not require that the restored tribe once owned the land in question . . . or mandate any particular quality of historical relationship between the restored tribe and restored land."  Pl.'s Mot. at 21.  While the statute may

not preclude the Band's interpretation, defendants contend that the statutory language does not have "*only one meaning* that can be applied."  Defs.' Mot. at 13 (emphasis in original).

As plaintiff acknowledges, *see* Pl.'s Mot. at 21, other courts have concluded that the restored lands exception is ambiguous.  *See County of Amador v. U.S. Dep't of the Interior*, 136 F. Supp. 3d 1193, 1222 (E.D. Cal. 2015) ("[T]he restored lands exception, 25 U.S.C. § 2719(b)(1)(B)(iii), is not further explained in that statute and it is ambiguous."), *aff'd*, 872 F.3d 1012 (9th Cir. 2017); *Redding Rancheria v. Salazar*, 881 F. Supp. 2d 1104, 1116 (N.D. Cal. 2012), *aff'd in part, rev'd in part sub nom. Rancheria v. Jewell*, 776 F.3d at 712 (affirming that Secretary reasonably implemented the restored lands exception); *Oregon v. Norton*, 271 F. Supp. 2d at 1277 ("No statutory provision defines the terms 'restore' or 'restoration of lands' and no provision expressly limits the Secretary's authority to interpret these terms.  Thus, I find the statutory language ambiguous[.]") (internal citation omitted).

Although the D.C. Circuit has not addressed the precise question presented in this case, in *City of Roseville*, it did consider the meaning of the term "restoration of lands" in the context of whether it would be proper to interpret the statute to require that restored land fall within the boundaries of the original reservation.  348 F.3d at 1025.  In that case, neighboring municipalities were challenging a decision by the agency to permit gaming under the IGRA on land taken into trust for the Auburn Indian Tribe to create a new reservation pursuant to the Auburn Indian Restoration Act.  *Id.* at 1021–22.  The Court of Appeals reviewed the relative strengths and deficiencies of each of the definitions proffered by the parties and ultimately concluded that "neither side can prevail by quoting the dictionary."  *Id.* at 1027.  Therefore, the Court said, it would turn "to context, for the court is to consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme."  *Id.* (internal quotation marks omitted).  Thus,

the limited authority available in this circuit suggests that the answer is not likely to be found in plain meaning alone.

Even when courts have found that the terms "restore" and "restoration" as used in section 2719 are unambiguous and should be construed in accordance with their plain meanings, they have also acknowledged that the terms may be read in "numerous ways." *Grand Traverse II*, 198 F. Supp. 2d at 935;[9] *see also Wyandotte Nation v. Nat'l Indian Gaming Comm'n*, 437 F. Supp. 2d 1193, 1214 (D. Kan. 2006) (noting that "several courts have had occasion to address the 'restoration of lands' exception, and have concluded that the term 'restoration' has a plain meaning that may be applied," but adding, "courts have held that the term may be interpreted in a variety of ways"). This observation seems inconsistent with the characterization of the language as "unambiguous," and after considering all of these precedents, the Court cannot find, for purposes of the first step of the *Chevron* analysis, that Congress has "unambiguously foreclosed the agency's statutory interpretation." *Catawba County*, 571 F.3d at 35.

## 2.   The structure and purpose of the provision.

The determination that the question cannot be resolved on the face of the statute alone is consistent with the structure, legislative history, and purpose of the IGRA. Plaintiff asserts that "the restored lands exception was intended to ensure that tribes lacking reservations in 1988 '[were] not disadvantaged relative to more established ones,'" and was "intended to compensate restored tribes not only for what they lost but also for opportunities those tribes lost in the interim while terminated." Pl.'s Mot. at 21, quoting *Koi Nation*, 361 F. Supp. 3d at 22. But defendants maintain – again relying upon non-binding authority from another circuit – that the IGRA seeks to

---

9      On appeal, the Sixth Circuit only considered "whether the Band is a tribe 'restored to federal recognition.'" *Grand Traverse Appeal*, 369 F.3d at 966.

balance competing concerns to "promote parity between established tribes, which had substantial

land holdings at the time of IGRA's passage, and restored tribes, which did not," and that to

accomplish this goal, "the Secretary needs to ensure that tribes do not take advantage of the

exception to expand gaming operations unduly and to the detriment of other tribes' gaming

operations."  Defs.' Mot. at 14, quoting *Rancheria v. Jewell*, 776 F.3d at 711.

In *City of Roseville*, the D.C. Circuit considered not only the language, but also the structure

and purpose of the statute in addressing the narrow question before it:  whether land restored to a

tribe *by statute* qualified as "lands taken into trust as part of . . . the restoration of lands" for

purposes of section 20(b)(1)(B)(iii), even if the property was not located on the tribe's former

reservation.  348 F.3d at 1024.

> The general purpose of IGRA is "promoting tribal economic development"
> and "self-sufficiency."  A reading allowing the [tribe] to participate in that
> economic base furthers this purpose of IGRA while a reading that confines
> "restoration of lands" to the old reservation . . . (most of which is now in
> the hands of homeowners, many non-Indian, and hence unavailable for
> development) would likely deny the Tribe this opportunity.
>
> . . . .
>
> [T]he exceptions in IGRA § 20(b)(1)(B) [25 U.S.C. § 2719(B)(i)(B)] serve
> purposes of their own, ensuring that tribes lacking reservations when IGRA
> was enacted are not disadvantaged relative to more established ones.  The
> Cities' position, that reading the "restoration of lands" exception to refer
> only to lands identical or comparable to lands held at the time of termination
> prevents "new" tribes from acquiring more rights than "old" ones, would
> frustrate this purpose.  A tribe's pre-termination reservation is, as here, not
> always available.  Given the passage of years between termination and
> restoration of federal recognition of tribes, it is likely that earlier reservation
> land could not easily be reestablished as a reservation for a restored tribe.  .
> . . If the "restoration of lands" exception applied only to such lands, the
> "equalization" purpose of the exception would mean very little in practice.
>
> . . . .
>
> [I]t would be anomalous for Congress to confine restored tribes to whatever
> of their pre-termination reservation is available while simultaneously
> allowing acknowledged tribes to conduct gaming anywhere on their initial

> reservation.  A far more sensible reading is that the "restoration of lands" is
> to a restored tribe what the "initial reservation" is to an acknowledged tribe:
> the lands the Secretary takes into trust to re-establish the tribe's economic
> viability.

*Id.* at 1030–31.  After reaching this determination, though, the Court was quick to point out the

limits of its ruling:  "the court has no occasion to decide whether land obtained by a tribe other

than through the tribe's restoration act is the 'restoration of lands' for IGRA purposes."  *Id.* at 1026.

In sum, the Circuit was comfortable announcing that *restored* (past tense) under another statute

means restored for purposes of the IGRA, and the policy considerations that supported its reading

of the text will bear on the reasonableness of the agency's interpretation in this case as well.  But

one cannot conclude based solely on the language of the statute, even when viewed in the context

of its structure and purpose, that Congress left no room for discussion and no gap for the Secretary

to fill with respect to the question of whether a particular parcel a tribe might ask the government

to take into trust to restore to it *in the future* would qualify.

### D.  *Chevron* Step Two:  The agency's interpretation of the statute is reasonable.

Under the traditional application of *Chevron* step two, a court is to defer to the agency's

interpretation of the statute as long as it is reasonable, *Serono Lab'ys*, 158 F.3d at 1321, that is, as

long as it is "based on a permissible construction of the statute."  *Chevron*, 467 U.S. at 843.  Here,

though, since the IGRA is a statute that is both ambiguous and intended for the benefit of Indian

tribes, the Indian canon of construction must also be part of the analysis.  *See Koi Nation*, 361 F.

Supp 3d. at 49, citing *Ho-Chunk, Inc. v. Sessions*, 894 F.3d 365, 369 n.4 (D.C. Cir. 2018).

Plaintiff argues that the regulatory requirement of a "significant" historical connection

imposes an "additional regulatory requirement," which "does not appear in IGRA and substantially

increases the evidentiary burden on restored tribes."  Pl.'s Mot. at 22.  Defendants submit that the

use of the adjective "significant" in Part 292 was simply meant to ensure that tribes had true

historic ties to the land they sought to qualify as restored lands under the IGRA.  *See* Defs.' Mot. at 14–15.

In undertaking a pure *Chevron* analysis, a reviewing court would accord "considerable weight" to an executive agency's construction of a statutory scheme it has been "entrusted to administer," *Chevron*, 467 U.S. at 844, and as part of that exercise, a court must "look to what the agency said at the time of the rulemaking—not to its lawyers' post-hoc rationalizations" when assessing the reasonableness of its interpretation.  *Council for Urological Ints.*, 790 F.3d at 222. But plaintiff points to nothing in the Notice of Proposed Rulemaking, *see* Notice of Proposed Rulemaking, Gaming on Trust Lands Acquired After October 17, 1988, 71 Fed. Reg. 58769 (Oct. 5, 2006) ("Notice of Proposed Rulemaking"), or the Final Rule that reflects an intention to change or tighten the requirements for securing agency approval under the restored lands exception.

Instead, the Notice of Proposed Rulemaking states simply that the agency was going to publish a new rule supplementing the one previously proposed to establish procedures for seeking a Secretarial Determination under section 2918(b)(1)(A) of the IGRA because it had "determined that the rule should address not only the exception contained in [section 2719(b)(1)(A)] of IGRA . . . , but also the other exceptions contained in [section 2719], *in order to explain to the public how the Department interprets these exceptions*."  71 Fed. Reg. 58770 (emphasis added).  The Notice proposed that section 292.11 ("What are 'restored lands?'") would read:

> For lands to qualify as "restored lands" for purposes of § 292.7, it must be demonstrated that . . . [i]f there is no restoration legislation, or if the restoration legislation does not provide geographic parameters . . . , the tribe has a modern connection and a significant historical connection to the land and there is a temporal connection between the date of the acquisition of the land and the date of the Tribe's restoration[.]

71 Fed. Reg. 58774.

25

The preamble that accompanied Part 292 when it was promulgated as a Final Rule explains the thinking behind the requirement that a tribe show a "significant historical connection" to a parcel for the land to be considered "restored lands" under the IGRA:

> [T]he word ["significant"] reinforces the notion that the connection must be something more than "any" connection.  The definition does not include a temporal requirement because such inquiry is highly dependant [sic] of the facts and circumstances of each tribe's historical connection to the land.

73 Fed. Reg. 29366.[10]  While it does not appear that any commenters objected to the inclusion of the word "significant" as being inconsistent with the IGRA, the agency rejected a number of commenters' suggestions that would have made it harder to establish a historical connection.  For example, "[o]ne comment suggested that the significant historical connection requirement should be uninterrupted connection.  Another comment suggested that the requirement should show historically exclusive use."  73 Fed. Reg. 29360.  Interior did not adopt these suggestions because "they would create too large a barrier to tribes in acquiring lands and they are beyond the scope of the regulations and inconsistent with IGRA."  *Id.*

Defendants point to case law predating the enactment of Part 292 in 2008 to show that Interior previously found it necessary to consider historical connections "in analyzing what [would] constitute[] 'restored lands' within the meaning of IGRA," and that the use of the word "significant" in Part 292 did not impose a new requirement or alter the process that had already been in place.  Defs.' Mot. at 14–15.

In *Grand Traverse II*, a 2002 case that Interior took into consideration when it formulated Part 292, *see* 73 Fed. Reg. 29365, the court analyzed whether land was subject to the IGRA's

---

10      In discussing the purpose of the restored lands exception writ large, the preamble notes that "the purpose of the exception is to assist restored tribes in economic development."  73 Fed. Reg. 29365; *see also City of Roseville*, 348 F.3d at 1030 ("The general purpose of IGRA is 'promoting tribal economic development' and 'self-sufficiency.'").

restored lands exception based on whether it was "located in an area of historical and cultural significance to the [Grand Traverse Band of Ottawa and Chippewa Indians] that was previously ceded to the United States." 198 F. Supp. 2d at 937.  It observed that "land that could be considered part of such restoration might appropriately be limited by the factual circumstances of the acquisition, the location of the acquisition, or the temporal relationship of the acquisition to the tribal restoration." *Id.* at 935.  It considered the Band's evidence, which the state involved in the case did not contest, that:

- The land was "at the heart of the region that comprised the core of the Band's aboriginal territory and was historically important to the economy and culture of the Band."

- The land "ha[d] been occupied by indigenous peoples for thousands of years," with "[t]he Band itself [] occup[ying] the region continuously from at least 100 years before treaty times until the present."

- "The site [was] at the heart of a region providing a range of important natural resources for food, shelter, tools, and medicine."

- "The region also was traversed by a network of trails extending along the shore of Grand Traverse Bay and connecting to major routes . . . that in turn connected with trails spreading across the continent."

- "In the late nineteenth century, Band members continued to reside on the east shore of Grand Traverse Bay and sought title to land in order to remain in the region."

- "[I]n the twentieth century, Band members continued to live on the east shore and maintained an economic, spiritual and cultural connection to the area," which "provide[d] services and economic development to its members located on the east shore."

*Id.* at 926.  The court found that the evidence "clearly established that the parcel was of historic, economic and cultural significance to the Band." *Id.* at 936.[11]  This finding, along with the fact

---

11    The "State experts [] opined that other locations also were of historical significance and arguably were more important to the Band." *Grand Traverse II*, 198 F. Supp. 2d at 936.  Even if this was true, the court noted it would "not undermine the evidence of historical significance." *Id.*

27

that "at the time of its acquisition, the parcel was intended to be part of a restoration of tribal lands," and "[a]s a matter of timing, the acquisition of the Turtle Creek site was part of the first systematic effort to restore tribal lands," led the court to conclude that the land at issue "was acquired as part of a restoration of lands to a restored tribe" under section 2719(b)(1)(B)(iii). *Id.* at 937.

Another case that Interior took into consideration when it formulated Part 292 was *Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt*. *See* 73 Fed. Reg. 29365. In that case, the court found that "the Assistant Secretary did not consider all matters which might entitle the plaintiff to an exception pursuant to section 2719(b)(1)(B)(iii)," and therefore remanded the decision "so the agency [could] make its full determination in light of this opinion." *Babbitt*, 116 F. Supp. 2d at 164. Notably, the agency had not considered materials that "contained information regarding the Confederated Tribes' historic and cultural connection to the Hatch Tract," and therefore, the court "suggest[ed] that the materials should be considered in light of today's opinion." *Id.* at 165.

The IGRA was also applied by the agency without the benefit of an interpretive regulation in the Bear River Band of Rohnerville Rancheria Indian Lands Opinion. *See* Letter from National Indian Gaming Commission ("NIGC") Acting Gen. Couns. to NIGC Chairman Deer (Aug. 5, 2002) (on file at https://www.nigc.gov/images/uploads/indianlands/2002.08.05%20Bear%20River%20Band%20I LO.pdf ) [hereinafter Rohnerville ILO]. There, Interior concluded that the land in question fell within the restored lands exception after considering: (1) the factual circumstances of the acquisition, *id.* at 10–11; (2) the location of the parcel at issue, which was off-reservation but

28

contained within an area to which the tribe had a historical nexus,[12] *id.* at 11–13; and (3) "facts surrounding the timing of the acquisition," *id.* at 14.   Based on this evidence, Interior concluded that the tribe showed "a historical and cultural nexus between the Tribe and the land." *Id.* at 14.

These examples illustrate the manner in which Interior evaluated a tribe's historical connection to the land in question before Part 292 was promulgated.  And in 2018, in *Butte County v. Chaudhuri*, the D.C. Circuit found – in an opinion that is binding on this Court – that Interior's analysis of a "sufficient historical connection" for purposes of the restored lands exception remained the same under the old *Grand Traverse* test and after Part 292 came into play:

> After we vacated the Secretary's decision, the Secretary reassessed whether the parcel qualified as "restored lands," this time applying both the *Grand Traverse Band [II]* test and the test established by the regulation [Part 292].  The Secretary concluded that, under either test, the parcel constitutes 'restored lands.'  On appeal, the County argues only that the Tribe lacks a sufficient historical connection to the Chico parcel.  *Because that consideration is common to both tests*, we have no occasion to consider whether one or the other test should control in the circumstances of this case.

887 F.3d at 508 (emphasis added).

---

12      The tribe submitted a report that included a narrative description and map showing the Tribe's historic use of the area in which the parcel was located.

> [W]ithin a one (1) mile radius of the parcel are:  a mythic pond that is the setting of an old tribal story; two (2) aboriginal villages, Howotkil and Wasala, that were major Wiyot settlements in 1850; and two major trails, Laloeka and Woxlok, that ran from the Eel River towards the north.  Within a three (3) mile radius of the parcel are:  five (5) aboriginal villages, Tokwherok, Sweanawochkro, Miplok, Wochwochkor, and Hokonwoyok; and a town founded in 1870 after European contact, Indianola.  Between three (3) and four (4) miles from the parcel is Table Bluff, the site of a mythic flood in a Wiyot story telling of the re-population of the world.  Within a six (6) mile radius of the parcel are:  the first Wiyot town established after European contact; [and] eleven aboriginal villages.

Rohnerville ILO at 12 (internal citations omitted).

29

After examining the materials in the Federal Register and the Department's restored lands decisions prior to 2008, the Court finds that Part 292 was intended to codify and explain Interior's existing practice of requiring tribes to have a significant historical connection to a parcel for the land to be considered "restored lands" under the IGRA.  The agency did not set out to make the provision more stringent; no commenter objected at the time that the language would have that effect, and the case law reflects the absence of a change.  Therefore, for purposes of the second step of the *Chevron* analysis, the Court finds that Part 292 is a permissible interpretation of the IGRA.

### E. The rule of statutory construction relating to Indian affairs does not require invalidation of the regulation.

Plaintiff argues that even if the "IGRA [were] deemed ambiguous with regard to the restored lands exception, the court is not obliged to defer to the agency's interpretation under *Chevron*" because "the deference normally extended to reasonable agency interpretation of ambiguous statutes may be trumped by a special rule applicable to the construction of statutes regulating Indian affairs, *i.e.*, that statutes enacted for the benefit of Indians must be liberally construed in favor of Indians, with ambiguous provisions interpreted to the Indians' benefit."  Pl.'s Mot. at 23–24.  "Because the agency's interpretation here conflicts with the best interests of a restored Tribe [Scotts Valley] that Congress intended to benefit, the gloss that the agency imposed on the statute by requiring that the historical connection be a 'significant' one violates IGRA, construed in accordance with this long-standing canon of statutory construction."  Pl.'s Mot. at 24.

Defendants and the amicus in the case argue that the canon does not apply in this situation because the outcome sought by plaintiff would benefit one tribe, Scotts Valley, but at the expense of others, such as the Yocha Dehe Wintun Nation. *See* Defs.' Mot. at 20; Mot. to Intervene [Dkt. # 17] at 1 (asserting that the land sought by Scotts Valley is "the ancestral territory and core

gaming market of Yocha Dehe"); Br. of the Yocha Dehe Wintun Nation as *Amicus Curiae* in Supp.

of the Fed. Defs. [Dkt. # 56] ("Amicus Br.") at 13–14 ("Scotts Valley's interests are diametrically

opposed to those of Yocha Dehe and other federally recognized tribes. . . . Therefore, the canon

does not apply.").  The Court does not find this to be a persuasive reason for declining to give any

consideration to the well-established canon.

       First of all, the fact that another tribe would be disadvantaged by a decision to take the

parcel into trust for the Band has not yet been established.  *See Yocha Dehe Wintun Nation v. U.S.

Dep't of the Interior*, 3 F.4th 427, 431–32 (D.C. Cir. 2021) (affirming denial of Yocha Dehe's

motion for leave to intervene, in part because "neither Yocha Dehe nor its property is the direct

subject of the Indian Lands Opinion [and] that opinion is too many steps removed from Yocha

Dehe's claimed threat of future harm from Scotts Valley's casino project for that harm to be

imminent"); Mem. Op. & Order [Dkt. # 33] at 9 ("Yocha Dehe has failed to show that these

potential future harms, which are not yet actual, can be characterized as imminent, or certainly

impending.") (internal quotation marks omitted).  We do not yet know the precise location or size

of any casino that would be approved even if the land were to be taken into trust for the Band.  *See

Koi Nation*, 361 F. Supp. 3d at 50  (rejecting the claim that the canon would not apply on the

grounds that "[t]he purported detrimental impact of one additional tribe potentially being able to

game on 'restored lands,' if any are acquired, on other tribes is highly speculative and falls far

short of showing any impact at all, let alone one that is detrimental to Indian tribes generally").

       More importantly, the government cannot point to any authority in this circuit that

recognizes such an exception to the well-settled rule.  *See Sault Ste. Marie Tribe of Chippewa

Indians v. Bernhardt*, 442 F. Supp 3d. 53, 80 (D.D.C. 2020) (noting that there is no circuit authority

establishing the supposed exception, and finding that even if such an exception existed, it would

not apply in that case), *rev'd on other grounds*, 25 F.4th 12 (D.C. Cir. 2022).  In *Eastern Band of Cherokee Indians v. U.S. Dep't of the Interior*, 534 F Supp. 3d 86 (D.D.C. 2021), the district court was faced with a situation that is distinguishable from the one at hand:  other tribes – including one with its own casinos, *id.* at 91 – were challenging the Department's decision to take land into trust for the Catawba tribe, thereby enabling it to construct a casino on the parcel.  *Id.*  But notwithstanding the obvious impact of the agency's decision and its interpretation of the law on the competing tribes, the court cited the Indian canon to give the defendant – and thus the tribe that had been awarded the land – the benefit of any ambiguity in the statute involved.  *See id.* at 100–01 ("This is not due to *Chevron* . . . but instead because of the principle that, in light of the trust relationship between the United States and Indians, 'statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'"), citing *Blackfeet Tribe*, 471 U.S. at 766.  The court also considered the plaintiffs' argument, based on Ninth Circuit precedent, that the canon did not apply where "all tribal interests are not aligned."  *Eastern Band of Cherokee Indians*, 534 F. Supp. 3d at 101, quoting *Rancheria v. Jewell*, 776 F.3d at 713.  It agreed with the court in *Sault Ste. Marie*, 442 F. Supp. 3d at 80, that the law was "unsettled," but it observed that the only cases in which the exception had been invoked involved laws, such as the IGRA, that were generally applicable to all tribes, as opposed to the statute before it, which contained a specific provision that only benefited one tribe.  *Id.*  Ultimately, the court did not reach the issue since it also concluded that even if the exception existed as a general matter, it did not apply to the dispute before it.  *Id.*

The government directs the Court to *Confederated Tribes of Grand Ronde Cmty. of Or. v. Jewell*, 75 F. Supp. 3d 387 (D.D.C. 2014).  In that case, once again, a competing tribal casino and nearby local governmental bodies were challenging an agency decision to take land into trust for

another tribe.  The district court stated, "the Indian canon of construction does not apply for the benefit of one tribe if its application would adversely affect the interests of another tribe," but it only cited Ninth Circuit precedent for that proposition.  *Id.* at 396, citing *Confederated Tribes of Chehalis Indian Reservation v. Washington*, 96 F.3d 334, 340 (9th Cir. 1996).[13]  It is notable, though, that when the Court of Appeals issued its opinion affirming the judgment in *Grand Ronde*, it simply declared itself to be "mindful" of the Indian canon and said nothing about the potential exception.  830 F.3d at 558.

In sum, there is no binding circuit authority on the matter, the government has pointed to no case in which a district court applied the exception when it was the tribe whose request for an ILO was *denied* that was adverse to the government, and the few district court cases that do acknowledge the exception predicate those comments on Ninth Circuit authority.  This Court does not find the Ninth Circuit's pronouncements on exceptions to the canon to be instructive, particularly since that court does not recognize the canon's applicability "in light of competing deference given to an agency charged with the statute's administration" in the first place.  *See Rancheria v. Jewell*, 776 F.3d at 713.  And here, the dispute involves the government's application of its interpretation of a statutory provision to exclude a tribe completely from the benefits conferred by the IGRA.  Under all of these circumstances, the Court will not set aside a settled principle of statutory construction based on out-of-circuit authority or dicta in non-binding district court opinions, and it will include the Indian canon as a factor in its analysis.

---

13      In *Connecticut v. U.S. Dep't of Interior*, 344 F. Supp. 3d 279, 314 (D.D.C. 2018), the court quoted the statement in the district court's opinion in *Grand Ronde*, but it found it unnecessary to go further since the statutory provision at issue was not ambiguous, and therefore the canon would not come into play.  *See also* Amicus Br. at 13.  It also noted, though, that it was not clear that the provision in question would benefit tribes generally.  *Connecticut*, 344 F. Supp. 3d at 314.

That being said, though, given the findings above that Part 292 did not narrow or contravene the IGRA in a way that changed the test to be applied, raised the bar to be overcome, frustrated its purposes, or favored the federal government over all tribes, the Indian canon does not mandate invalidating the long-standing regulation. Even without the qualifier "significant" in the challenged regulation, Interior would have been required to assess whether Scotts Valley had sufficient historic ties to the Vallejo Parcel to support its request under the IGRA. *See* Defs.' Mot at 19 ("[T]he Tribe makes no attempt to argue that, in the absence of the significant historical connection requirement, the Vallejo Parcel would have qualified as restored lands either under the *Grand Traverse* factors or under some other interpretation of IGRA itself."). Therefore, it is the agency's application of that test in this instance that must be subjected to scrutiny, and the regulation itself will stand.

## II.    Part 292 does not contradict the IRA.

Plaintiff's other statutory argument is that even if the Court finds that the restored lands exception is ambiguous and the Secretary's interpretation of the statute in Part 292 is entitled to some deference, "the 'significant historical connection' limitation imposed upon IGRA by the regulation violates another provision of law[,] [s]pecifically the IRA." Pl.'s Mot. at 24. The IRA prohibits the federal government from adopting any regulation "that classifies, enhances, or diminishes the privileges and immunities available to other federally recognized tribes," 25 U.S.C. § 5123(g), and according to plaintiff, Interior treated Scotts Valley "differently than restored tribes whose ILO requests were decided before adoption of the Part 292 regulation with regard to the historical connection requirement." Pl's Mot. at 25.

Plaintiff points to a previous agency decision involving the Pokagon Tribe in which, according to plaintiff, the agency found that the land sought was "part of a restoration simply on the basis that the lands at issue were within the twenty-county area ceded by the tribe to the United

34

States."  Pl.'s Mot. at 25, quoting *Grand Traverse II*, 198 F. Supp. 2d at 935.  It points to Interior's

justification for denying Scotts Valley's application to game on the Vallejo Parcel under the

restored lands exception:

> Furthermore, there are fundamental differences between the legal analysis
> in the Pokagon Band Opinion and the one required here.  First, the Pokagon
> Band Opinion predated the implementation of 25 C.F.R. Part 292 by more
> than ten years, and it did not discuss the modern, temporal, and significant
> historical connections described in § 292.12 that are central to the Scotts
> Valley Band determination.  Even if the Pokagon Band Opinion established
> a standard whereby lands ceded by treaty qualify, *per se*, as restored lands—
> which it does not—the Department did not incorporate that standard into
> the criteria deemed necessary for lands to qualify as restored when it
> promulgated Part 292, which the Band must now satisfy.

ILO at 9, Admin. R. at AR0011605 (footnotes omitted); *see* Pl.'s Mot. at 26.

Defendants, on the other hand, contend that Part 292 does not violate the IRA because

"Scotts Valley is not similarly situated to Pokagon Band."  Defs.' Mot. at 45.  At bottom, they

argue, "there was no *per se* rule applied to the Pokagon Band," and there "are important factual

distinctions between the Vallejo Parcel from the Pokagon's restored lands[,] factual distinctions

that have nothing to do with the requirements of Part 292."  Defs.' Mot. at 44.

The Court has already discussed the *Grand Traverse II* opinion above.  In that case, the

*Grand Traverse II* court analyzed whether land was subject to the IGRA's restored lands exception

based on whether it was "located in an area of historical and cultural significance to the Band that

was previously ceded to the United States," 198 F. Supp. 2d at 937, and it concluded that the

evidence "clearly established that the parcel was of historic, economic and cultural significance to

the Band."  *Id.* at 936.  The court approved the agency's consideration of multiple historic,

economic, and cultural connections when determining whether the parcel qualified as "restored

lands" under section 2719(b)(1)(B)(iii), and the same process was ultimately codified in Part 292.

Part 292 was intended to memorialize – not alter – Interior's practice of requiring tribes to have a significant historical connection to a parcel for the land to be considered "restored lands" under the IGRA.  Therefore, the Court finds that in 2008, when the agency adopted the regulation that it applied eleven years later in the Scotts Valley ILO, it did not classify, enhance, or diminish the privileges and immunities available to other federally recognized tribes in violation of the IRA.

III.   **The agency's application of Part 292 to the Band's request for an ILO may satisfy *Chevron,* but it is inconsistent with the policy underlying the IGRA, and the Indian canon of construction requires that any doubts be resolved in favor of the Band.**

A.  **The agency supplied reasons for its decision and applied the factors in the regulation to the facts before it.**

Having determined that the regulation itself passes muster and is a reasonable interpretation of the IGRA, the next step in the Court's analysis is to ensure that the ILO is not otherwise arbitrary and capricious.  As the D.C. Circuit has explained, agency action will be upheld if the agency "has considered the relevant factors and articulated a 'rational connection between the facts found and the choice made.'"  *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007), quoting *Allied Loc. & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 68 (D.C. Cir. 2000). In the ordinary APA context, this review is "[h]ighly deferential" and "presumes the validity of agency action."  *Id.*, citing *AT&T Corp. v. FCC*, 349 F.3d 692, 698 (D.C. Cir. 2003).[14]

This is not to say, however, that courts are expected to rubber stamp agency decisions.  *Nat. Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 755 (D.C. Cir. 2000).  Courts need not defer to "conclusory or unsupported suppositions."  *United Techs. Corp., Pratt & Whitney Div. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010), quoting *McDonnell Douglas Corp. v. U.S. Dep't*

---

14     Even if the government were to take the position that it was owed limited deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), *see, e.g.*, *City of Roseville*, 348 F.3d at 1025, any decision that passes muster under *Chevron* necessarily withstands any deference accorded under *Skidmore*.  *See United States v. Mead Corp.*, 533 U.S. 218, 234–35 (2001).

*of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004).  The Court's job is "to evaluate the rationality of [the agency's] decision."  *Mississippi v. EPA*, 744 F.3d 1334, 1348 (D.C. Cir. 2013).  It must be satisfied that the agency has examined the relevant data and articulated a satisfactory explanation for its action, "including a 'rational connection between the facts found and the choice made.'"  *Alpharma, Inc.*, 460 F.3d at 6, quoting *State Farm*, 463 U.S. at 43.  The Court may not accept post hoc rationalizations for agency action.  *State Farm*, 463 U.S. at 50, citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962).  Thus, when an agency "has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action.'"  *City of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999), quoting *Bellsouth Corp. v. FCC*, 162 F.3d 1215, 1222 (D.C. Cir. 1999) (internal quotation marks omitted).

Plaintiff argues that, even if the Department did not act outside of its statutory authority by requiring tribes to demonstrate a "significant historical connection," the ILO is arbitrary and capricious and should be remanded for reconsideration because the opinion:  (1)  "failed to comply with the governing regulation"; (2) "failed to take relevant considerations and data into account"; and (3) "failed to consider the Tribe's evidence *in toto*."  Pl.'s Mot. at 27.

A tribe seeking to establish a connection to newly acquired lands for purposes of section 292.11 must have "been restored to Federal recognition," 25 C.F.R. § 292.7(a)–(c),[15] and it must also meet the criteria set out in section 292.12, including that it "demonstrate a significant

---

15    The ILO acknowledges that Scotts Valley met the requirement of the first part of the two-part restored lands exception:  the tribe "qualified as a restored Tribe for the purposes of the restored lands exception."  ILO at 3, Admin. R. at AR0011599.  It cites to Interior's publication of the notice of the Band's Federal recognition status.  ILO at 3, Admin. R. at AR0011599; *see* Notice of Reinstatement.

37

historical connection to the land." 25 C.F.R. § 292.12(b).[16]   Pursuant to section 292.2, "[s]ignificant historical connection means the land is located within the boundaries of the tribe's last reservation . . . , or a tribe may demonstrate by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land." 25 C.F.R. § 292.2.

The ILO sets out the agency's reasoning as to why the tribe failed to make this connection to the Vallejo Parcel in a nineteen-page document.   It starts by summarizing its decision in Section I ("Decision"), and then Section II ("Legal Framework") lays out the applicable legal framework, which is not disputed.  ILO at 1–4, Admin. R. at AR0011597–600.  Section III ("Application of Restored Lands Criteria to the Vallejo Parcel") contains the agency's analysis as to whether the Vallejo Parcel qualifies as "restored lands" within the meaning of the IGRA.  ILO at 4–19, Admin. R. at AR0011600–15.   Finally, the ILO concludes with Section IV ("Conclusion"), a two-paragraph summary of the decision.  ILO at 19, Admin. R. at AR0011615.

At the outset in Section III(a), the ILO explained that because Scotts Valley established "a line of political succession and significant genealogical descent" from two tribes, the Ca-la-na-po and Mo-al-kai, it would also be necessary to account for any evidence of those tribes' historical connections to the Vallejo Parcel.  ILO at 4–5, Admin. R. at AR0011600–01.

In Section III(b), the agency considered whether Scotts Valley could demonstrate a significant historical connection to the Vallejo Parcel based on evidence that "the land is located within the boundaries of the tribe's land reservation."  25 C.F.R. § 292.2.  It found that "[b]ecause the Vallejo Parcel is not located within the boundaries of the Band's last reservation (or the

---

16      The ILO notes that Scotts Valley had "demonstrated the required modern and temporal connections to the Parcel," which is also mandated by 25 C.F.R. § 292.12.  ILO at 3, Admin. R. at AR0011599.

reservation promised to its ancestors),” the Band could not establish the necessary historical connection in that way.  ILO at 5, Admin. R. at AR0011601; ILO at 6, Admin. R. at AR0011602 (“The Vallejo Parcel is located . . . outside of the boundaries of the reservation under the 1851 Treaty” and “is similarly far from the rancheria that the United States acquired for the Band in 1911[.]”).  Plaintiff does not appear to dispute this finding.

Section III(c) of the ILO acknowledges that although the Vallejo Parcel is not within the boundaries of the Band’s last reservation, “a parcel’s proximity to a tribe’s historic reservation or rancheria is evidence that the tribe has a significant historical connection to that parcel.”  ILO at 6–7, Admin. R. at AR0011602–03 (internal brackets omitted) (ILO citing favorable restored lands determination for Wilton Rancheria where land at issue was “less than six miles from the tribe’s historic rancheria,” and determination for Mechoopda Indian Tribe of the Chico Rancheria where “land at issue was only ten miles from the tribe’s former Rancheria”).  But that did not suffice in the agency’s view either.  “[T]he Parcel is located approximately 90 driving miles (75 straight-line miles) southeast of the former Scotts Valley Rancheria, near the present-day city of Lakeport.  As such, the distance between the Vallejo Parcel and the Band’s historic Rancheria, standing alone, does not evince a significant historical connection.”  ILO at 7, Admin. R. at AR0011603.

Scotts Valley argues that the ILO improperly relied upon the distance of the Parcel from the Tribe’s former rancheria.  “The significant historical connection requirement contains no geographic proximity limitation, either in the requirement or in the definition,” so, “if lands are historically significant and located within the same state as the tribe, the distance of restored lands from the tribe’s aboriginal territory or reservation is irrelevant.”  Pl.’s Mot. at 31.

Plaintiff cites an excerpt from the Final Rule in which the BIA responded to a commenter’s suggestion that “the tribes should be required to analyze sites that are close to aboriginal

39

homelands." 73 Fed. Reg. 29361; *see* Pl.'s Mot. at 31.  The agency wrote, "[t]his recommendation was not adopted.  Newly acquired lands with significant historical and cultural connections may or may not include those that are close to aboriginal homelands." 73 Fed. Reg. 29361.  According to plaintiff, this means "the Department rejected a geographic limitation on the significant-historical-connection requirement when it promulgated the regulation," and therefore, the distance of restored lands from the tribe's aboriginal territory or reservation should not factor into Interior's analysis.  Pl.'s Mot. at 31.  But while it is true that this statement recognizes that distance may not be determinative – qualifying parcels "may or may not" be close to aboriginal parcels – it was simply recognizing that distance alone would not *preclude* a tribe from establishing a significant historical connection to a parcel.  *See* Defs.' Mot. at 28.  It did not rule out distance as a fact to be considered.  And here, the ILO did not reject the parcel on that basis, but it observed that distance between the tribe's former rancheria and the Vallejo Parcel was not sufficiently close to *advance* Scotts Valley's case without more.  *See* ILO at 7, Admin. R. at AR0011603 ("[T]he distance . . . standing alone, does not evince a significant historical connection."); *see also* Defs.' Mot*.* at 29.[17]

Next, in Section III(d), the ILO considered whether Scotts Valley could demonstrate a significant historical connection to the Vallejo Parcel by showing through "historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use

---

17      At bottom, plaintiff and the government are saying the same thing.  Plaintiff asserts that the distance of acquired lands from the tribe's aboriginal territory or reservation is irrelevant "*if lands are historically significant* and located within the same state as the tribe."  Pl.'s Mot. at 31 (emphasis added).  The Final Rule said, "[n]ewly acquired lands *with significant historical and cultural connections* may or may not include those that are close to aboriginal homelands." 73 Fed. Reg. 29361 (emphasis added).  So these statements, which are consistent with the requirement in Part 292 that a tribe seeking to establish a connection to newly acquired lands "located within the States where the tribe is now located" must "demonstrate a significant historical connection to the land," 25 C.F.R. § 292.12(a)–(b), do not answer the question of whether that connection has been shown.

40

in the vicinity of the land." 25 C.F.R. § 292.2; *see id.* § 292.12(b).  Because "[t]he Band [did] not assert that the Parcel [was] in the vicinity of the Band's villages or burial grounds,"[18] the question became only whether the tribe could show "occupancy or subsistence use in the vicinity of the land," or whether the tribe could show occupancy or subsistence use by the Ca-la-na-po or Mo-al-kai tribes.  ILO at 7, Admin. R. at AR0011603.

Section III(d)(i) reviews Scotts Valley's contention that the fact that the land is located within the area that its ancestors ceded to the United States pursuant to the unratified 1851 Treaty was enough to establish a significant historical connection to the Vallejo Parcel.  ILO at 7, Admin. R. at AR0011603; Admin. R. at AR0000016–28.  The tribe argued in its request for an ILO that

> land which a tribe previously ceded to the United States is land capable of being "restored" to the tribe within the plain meaning of that term and therefore is land to which that tribe has a "significant historical connection" and qualifies as "restored land" (where the other requisite connections— modern and temporal—exist) when taken into trust for that tribe.

Admin. R. at AR0000016; *see* Admin. R. at AR0000014–16.  The tribe relied on two decisions: *Grand Traverse II* and the agency's Pokagon Band decision.  In both cases, the tribes or their predecessors had ceded land to the United States by way of treaty, and Interior later returned these lands to the tribes under the restored lands exception.  *See Grand Traverse II*, 198 F. Supp. 2d at 936–37; Mem. from Solic., U.S. Dep't of the Interior, to Sec'y (Sept. 19, 1997) (on file at https://www.doi.gov/sites/doi.opengov.ibmcloud.com/files/uploads/M-36991.pdf)    [hereinafter Pokagon Band ILO].

---

18      *See* Scotts Valley's Combined Br. in Opp. to Fed. Defs.' Cross-Mot. for Summ. J. and Reply Br. in Supp. of Scotts Valley's Mot. for Summ. J. [Dkts. # 57, 58] at 10–11 n.8 ("[T]he Tribe never claimed aboriginal title to the area in the vicinity of the Parcel.  The Tribe acknowledged that its villages were located further north, around Clear Lake, in pre-contact times, with Patwin villages located in the south near the Parcel.") (internal citations omitted).

41

But as the Court has already noted, in *Grand Traverse II*, Interior also considered the historic, economic, and cultural connections that the tribe had to the land to determine whether the parcel at issue qualified as "restored lands."  198 F. Supp. 2d at 937 (concluding that parcel sought by Grand Traverse Band was "located in an area of historical and cultural significance to the Band that was previously ceded to the United States").  Thus, the ILO distinguished the facts in *Grand Traverse II* from those presented by Scotts Valley on that basis:  for the Grand Traverse Band, "the land at issue was located only 1.5 miles outside of the reservation," as opposed to the 90 miles by road outside of the Scotts Valley Band's aboriginal territory, and the Grand Traverse tribe had "continuously resided on the land in question for uninterrupted centuries."  ILO at 8, Admin. R. at AR0011604; *see Grand Traverse II*, 198 F. Supp. 2d at 925.  Accordingly, "[t]he fact that the parcel fell within the boundaries of land the Band's predecessors had ceded via treaty was merely one of several facts supporting that conclusion, but it was not a stand-alone proposition . . . ."  ILO at 8, Admin. R. at AR0011604.

As for the Pokagon Band opinion, Interior reasoned that "[s]ince the lands proposed for acquisition . . . [were] part of the territory the Bands' predecessors ceded to the U.S. in earlier treaties, these proposed acquisitions . . . [were] properly characterized as 'restored' lands."  Pokagon Bands ILO at 7–8.  But the lands were also located "within the areas historically occupied by the tribe[]."  *Grand Traverse II*, 198 F. Supp. 2d at 935 (discussing Pokagon Band's "essentially identical history to the Grand Traverse Band").  Further, the parcel sought by the Pokagon Band was within the tribe's ten-county "service area," an area designated by Congress when it restored the Pokagon Band.  ILO at 8–9, Admin R. at AR0011604–05; Restoration of Federal Services to Pokagon Band of Potawatomi Indians, Pub. L. 103–323, 108 Stat. 2152 (1994) (allowing the Pokagon Band to "exercise jurisdiction over all its members who reside within the service area in

42

matters pursuant to the Indian Child Welfare Act of 1978 . . . as if the members were residing upon

a reservation").

Thus, the ILO correctly observed that neither opinion established that "lands ceded by

treaty and subsequently returned to a tribe qualify, *per se*, as restored lands for the purposes of the

restored lands exception."  ILO at 7, Admin. R. at AR0011603.  The ILO did acknowledge that

the location of the Vallejo Parcel within ceded territory created a "favorable inference" for Scotts

Valley, but it concluded that "additional historical connection" was needed for the tribe to make

the necessary showing.  ILO at 10, Admin. R. at AR0011606.

In Section III(d)(ii), the ILO analyzed whether the Vallejo Parcel's designation as a pick-

site for promised supplies from federal officials demonstrated occupancy or subsistence use in the

vicinity of the Parcel by the tribe or its ancestors.  ILO at 10–11, Admin. R. at AR0011606–07.

As plaintiff points out in its motion, Article 5 of the unratified 1851 Treaty "directed the delivery

of subsistence provisions, beef and flour, to the signatory tribes each year for a period of three

years 'at or near Vallejo' in the ceded territory and part of Rancho Suscol."[19]  Pl.'s Mot. at 3; *see*

ILO at 10, Admin. R. at AR0011606.  But because the arrangement lasted for only three years,

and the location was designated as the pick-up spot only because it was "convenient for federal

officials who were reluctant to deliver provisions to the Clear Lake bands in the mountainous

territory where they lived," the ILO also rejected this argument.  ILO at 10–12, Admin. R. at

AR001606–08.  Interior cited the Guidiville Restored Lands Determination, in which Interior was

also deciding whether to acquire a parcel of land in trust for gaming purposes, as instructive.  *See*

Letter from Larry Echo Hawk, Assistant Sec'y – Indian Affairs, U.S. Dep't of the Interior, to

---

19    ILO at 13, Admin R. at AR0011609 (Rancho Suscol is the "rancho within which the
Vallejo Parcel is located"); *see* ILO at 18, Admin. R. at AR0011614 ("the boundaries of Rancho
Suscol would have surrounded the Vallejo Parcel").

Merlene Sanchez, Chairperson, Guidiville Band of Pomo Indians (Sept. 1, 2022) (on file at https://www.bia.gov/sites/default/files/dup/assets/public/pdf/idc015051.pdf)        [hereinafter Guidiville Band ILO] at 1.  The Guidiville tribe submitted evidence of an aboriginal trade route between the Clear Lake region and the Pacific coast to show "use and occupancy of the Bay Area." *Id.* at 14.  But Interior concluded that the Guidiville Band could not

> establish its subsistence use or occupancy based on the fact that its ancestors traveled to various locations to trade and interact with other peoples and then returned to the Clear Lake region.  Subsistence use and occupancy requires more than a transient presence in an area.

*Id.* at 14.  The situation as it related to Scotts Valley was "analogous," Section III(d)(ii) reasoned, and similarly could not establish subsistence use or occupancy.  ILO at 11, Admin. R. at AR0011607.

Section III(d)(iii) went on to discuss whether evidence of the Band's ancestor Augustine could demonstrate the presence of other tribal members in close vicinity to the Parcel.  ILO at 12–19, Admin R. at AR0011608–15.

Scotts Valley submitted a report to Interior showing that Augustine was part of a group of children who were baptized at Mission San Francisco Solano, located fifteen miles from the Vallejo Parcel.  Admin. R. at AR0005300, AR0005303; Pl.'s Mot. at 35; *see* ILO at 13, Admin. R. at AR0011609.  These children were ethnically identified as "Chujuluya/Potriqui-Yomi" in the 1837 baptismal record; while there was no village known as Chujuluya or Potriqui-Yomi, the report estimated that these children "represented 60% of the juvenile population of the village," Admin. R. at AR0005303, and that "[t]he proportion of the current Scotts Valley Indian population that is descended from the three Band ancestors baptized at the mission in 1837 is very large," with 201 out of 213 Scotts Valley enrolled members descended from these individuals.  Admin. R. at AR0005304; *see also* Admin. R. at AR0005316, AR0004567–70.  With this evidence, the

44

Band sought to confirm a "significant tribal connection" to the Vallejo Parcel.  Admin. R. at AR0005316.

The ILO considered this evidence:

> The earliest reference to Augustine suggested by the Band seems to be on a list of Indian children baptized in 1837 at Mission San Francisco Solano, located in the city of Sonoma, 17 miles from the Parcel.  This list includes a six-year-old child named Agustin who "could have been [the Band's ancestor] Augustine, but this is not verified."  According to the Band, 29 other Pomo children were baptized at the mission at the time, at least 14 of whom were from the same village as Augustine, and at least two of whom were ancestors of the present-day Band.

ILO at 13, Admin. R. at AR0011609.  It continued:

> [A]lthough allegedly baptized at Mission San Francisco Solano in Sonoma, Augustine returned to Clear Lake shortly thereafter to witness Salvador Vallejo's takeover.
>
> . . . .
>
> The record does not disclose how long Augustine or any other children remained in residence at the mission.  Nor does the record document the extent of religious instruction or vocational training received by the Band's ancestors, which the Band alleges took place.  Thus, insofar as the Band seeks to establish a close connection with the Parcel based on its ancestors' presence at the mission, the evidence is insufficient.

ILO at 17, 17 n.119, Admin. R. at AR0011613 (internal citations omitted).

While plaintiff argues that evidence relating to the presence of the tribe's ancestors at the Mission San Francisco Solano was "ignored," Pl.'s Mot. at 35, this is not the case – the ILO directly addressed the tribe's evidence pertaining to the presence of the tribe's ancestors at the Mission San Francisco Solano but gave it less weight than the Band maintained it deserved, deeming it "insufficient" to establish a close connection with the Vallejo Parcel.  ILO at 17 n.119, Admin. R. at AR0011613.

The ILO also addressed other evidence that the tribe had submitted showing Augustine's presence in the Clear Lake area:

45

- "Augustine had returned to the Clear Lake area by around 1840, where he observed Salvador Vallejo take 'formal possession' of the valley where the Band's ancestors lived."  ILO at 13, Admin. R. at AR0011609.

- The Vallejo family acquired Ranchos Suscol and Petaluma, and "at any one time there may have been between 600 and 1000 Indian laborers living there. . . . Salvador Vallejo raided Pomo Indian communities in order to force them to work on the ranchos owned by the Vallejos and others. . . . According to the Band's historian, the Band's ancestors, including Augustine, helped tend the thousands [of] animals that roamed in Big Valley and drove cattle to slaughter grounds on San Pablo Bay."  ILO at 13–14, Admin. R. at AR0011609–10 (internal quotation marks omitted).

- "In 1847, Salvador Vallejo sold Rancho Lup-Yomi to new owners, who at one point used Augustine and other Indians as forced labor to build adobe houses in Sonoma.  Augustine escaped after about a month and fled back to Clear Lake where his wife and infant child resided."  ILO at 14, Admin. R. at AR0011610 (internal footnotes omitted).

- "Augustine next appears in an 1850 census . . . that identifies him as a 'Kulanapo' chief, living at Clear Lake in an Eastern Pomo village."  ILO at 14, Admin. R. at AR0011610.

- According to 1870 census data for Napa City Township, "at age 38, Augustine was living in a household of 17 Indians of varying ages, a collection of native people working out from the household.  The Band also identifies a few other possible or confirmed ancestors living in Napa in 1870. . . . Augustine and the other Indians in the household may have been working at nearby Rancho Tulucay at the time, approximately 11 miles north of the Vallejo Parcel."  ILO at 14–15, Admin. R. at AR0011610–11 (internal footnotes omitted).

- "Augustine's name next appears in the 1880 census data for Lakeport Township . . . which places him, age 50, in a household with his wife Mary, his brother or Mary's brother, and two younger males, ages 15 and 40.  The 1880 Lakeport census lists many other households occupied by Indian families in the area, which is approximately 90 miles by road (75 straight-line miles) northwest of the Vallejo Parcel, including the household next to Augustine's . . . ."  ILO at 15, Admin. R. at AR0011611.

- "By 1911, the year that the United States acquired the Scotts Valley Rancheria for the Band, a number of Augustine descendants and relatives were present at the rancheria and continued to reside at Lakeport through the mid-1900s, although the Band contends that it also maintained a connection with Napa County through 1918, as demonstrated by a contemporaneous record indicating that several Scotts Valley people

46

contracted the Spanish influenza there." ILO at 15, Admin. R. at AR0011611.

Section III(d)(iii) of the ILO identifies shortcomings with this evidence as well. First, it points out that, although the tribe provided evidence about Augustine and other Indian laborers, it was unable

> to demonstrate that its specific predecessors (the Ca-la-na-po and Mo-al-kai)—as opposed to Indians generally (Pomo or otherwise) in the Clear Lake area—occupied land or engaged in subsistence use in the vicinity of the Parcel.
>
> . . . .
>
> Even if the Band were a successor-in-interest not only to the Ca-la-na-po and Mo-al-kai, but also to the Ha-bi-na-po, the Department cannot assume without more information that references to Clear Lake Bands and to the Band's predecessors are one and the same given the variety of ethnic groups and the number of tribelets that lived around the lake and worked on North Bay ranchos.

ILO at 16, Admin. R. at AR0011612.

Moreover, the ILO concluded that "it would be erroneous to attribute the connections made by a specific tribal member like Augustine, or a handful of members, to the entire Band, or to its predecessors." ILO at 16, Admin. R. at AR0011612. It explained:

> Augustine's varied and singular experiences—his possible baptism at the Mission San Francisco Solano in 1837, his construction of houses in Sonoma in the late 1840s, his dwelling in Napa in 1870, among others—are of limited evidentiary value in establishing the significant historical connections of [the] Band *in toto*.

ILO at 17, Admin. R. at AR0011613. While plaintiff asserts that Interior's conclusion "directly contradicts the evidence of Augustine and other members' actual residence as ranch laborers in the vicinity of the Vallejo Parcel," Pl.'s Mot. at 35, it cannot be said that there was no "reasoned evaluation of the relevant information." *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 385 (1989).

The ILO goes on to say that

47

> even assuming that Augustine's living and labor patterns are representative of those of the Band's ancestors, such patterns do not constitute occupancy or subsistence use.  In fact, Augustine's back-and-forth movements between the Clear Lake area and the North Bay region reveal an inconsistent, if not transitory, presence at odds with the Band's claim to occupancy and subsistence use of the Parcel.[20]
>
> . . . .
>
> [E]ven if Augustine's experience as [a] migrant worker extended to the Band's other ancestors, and even if such work constituted occupancy or subsistence use, there is no evidence—direct or inferential—indicating that the Band's ancestors conducted such activity on the Parcel (as opposed to elsewhere).

ILO at 17–18, Admin. R. at AR0011613–14.  Interior contrasted evidence of Augustine's "back-and-forth movements," ILO at 17, Admin. R. at AR0011613, with the evidence that it considered in *Grand Traverse II*.  The Grand Traverse Band had "occupied the region continuously from at least 100 years before treaty times until the present," which contributed to Interior's decision that the parcel the Grand Traverse Band sought was historically significant.  198 F. Supp. 2d at 925; *see id.* at 936.  And although the Scotts Valley ILO noted that "the definition of a 'significant historical connection' does not include a temporal requirement" – and the government maintains that no such showing was required, *see* Defs.' Mot. at 26 – Interior found that "Augustine's on-again, off-again presence in the North Bay region over a 30- to 40-year span stands in stark contrast to the description of, for example, the Grand Traverse Band's continuous, centuries-old connection

---

20      Plaintiff also points to a report in the record that describes labor patterns of Indians from Clear Lake.  Pl.'s Mot. at 36; *see* Admin. R. at AR0005026.  It argues that "this important evidence . . . goes directly to the evidentiary defects in the Tahsuda letter and yet was ignored."  Pl.'s Mot. at 36.  But the ILO does not ignore this evidence.  Rather, it explains that even if Augustine's labor movements between the Clear Lake area and the North Bay region were representative of the tribe's ancestors, they would still not demonstrate occupancy and subsistence use of the Vallejo Parcel.  ILO at 17, Admin. R. at AR0011613; ILO at 14, Admin. R. at AR0011610 (noting that between 1850 and 1870, "Indians from the Clear Lake area started engaging in a pattern of migrant labor on ranchos south of their aboriginal territory" and "mixed seasonal work on ranchos in Napa Valley and elsewhere in the North Bay region with subsistence farming and fishing at Clear Lake") (internal footnotes omitted).

48

to the parcel of land at issue in *Grand Traverse Band*."  ILO at 17, Admin. R. at AR0011613

(internal footnotes omitted).[21]

Finally, Section III(d)(iii) explained that "[i]f the Band [could not] provide direct evidence

of historic use or occupancy on the Parcel itself, then it must provide direct evidence of historic

use or occupancy close enough to the vicinity of the Parcel that one could naturally infer that the

Band also used or occupied the Parcel."  ILO at 18, Admin R. at AR0011614.[22]  The Band had

asserted that its ancestors worked at various ranchos owned by the Vallejos and asked Interior to

draw an inference that its ancestors also worked at Rancho Suscol, the ranch surrounding the

Vallejo Parcel.  ILO at 18, Admin. R. at AR0011614.  But in the agency's view, this was not

enough or the "direct evidence" needed; the ILO concluded that "such an inference, even if

---

21    Plaintiff maintains that "the Tahsuda letter overlooked another pre-regulation decision for
the Karuk Tribe," where "the Department relied principally upon the location of the parcel in an
area ceded by the tribe in an unratified treaty (like the Tribe here), corroborated with evidence of
episodic tribal activity in the area."  Pl.'s Mot. at 30.  While the Karuk Indian Lands opinion does
not describe the tribe's connection to the lands it sought for gaming as uninterrupted, Interior's
NIGC concluded that the lands requested by the Karuk tribe were eligible for gaming because the
tribe's connection to the lands were "long-standing" and "significant."  Mem. from John R. Hay,
Senior Att'y, NIGC, to Tracie Stevens, Chairwoman (Apr. 3, 2012) (on file at
https://www.nigc.gov/images/uploads/indianlands/Karuk4912.pdf) at 10–11.  This was based on
a report that found that the tribe's aboriginal sub-entities maintained camp sites on the parcel at
issue, and that the tribe conducted other activity on the parcel prior to federal recordkeeping for
that area.  *Id.* at 10.

22    During the motions hearing, Interior elaborated:

> [T]he vicinity language . . . broadens the amount of things that a tribe could
> bring in to show their connection with the parcel because Interior didn't
> want to limit it strictly to the parcel because that could be very difficult or
> even impossible in some situations.  So what Interior said is if you can show
> us that you have sufficient use, occupancy in the vicinity of the parcel, we
> can infer that you used the parcel for 'in the vicinity' is enough.  As I said,
> here they did not even show they were close enough in the vicinity to imply
> use of the actual parcel.

Tr. of Mots. Hr'g at 47:2–11, Scotts Valley Band of Pomo Indians v. U.S. Dep't of the Interior,
No. 19-cv-1544 (D.D.C. Feb. 25, 2022) [Dkt. # 62].

granted, is insufficiently broad and cannot serve as the basis to connect the Band with the Parcel itself."  ILO at 18, Admin. R. at AR0011614.

Plaintiff argues that this conclusion demonstrates that the ILO improperly required evidence of tribal use to reflect use of the "particular parcel itself."  Pl.'s Mot. at 28.  It points to the *Butte County* case, where the Secretary of the Interior concluded that the Mechoopda Tribe had a sufficient historical connection to the Chico parcel because the "parcel sits only '10 miles from the Tribe's former Rancheria,'" and "[i]n light of that 'close proximity,' the Secretary considered it appropriate to treat the Tribe's historical connections to the Rancheria as connections to the parcel itself."  *Butte County*, 887 F.3d at 508.  The county in which the parcel of land was located challenged the Secretary's decision to take the land into trust, but it did "not dispute that the Tribe ha[d] meaningful historical connections to the Rancheria," or dispute whether those connections were an "'adequate and independent' rationale" that would support the Secretary's decision.  *Id.*  Therefore, the Court did not "resolve the adequacy of [the Secretary's] rationale." *Id.*  But in addition to the proximity evidence, the Secretary also considered that "the Tribe also had direct historical connections to the Chico parcel, *not just the nearby Rancheria*," because:  "its members had been scattered across several villages located on, or 'very close to,' the parcel"; members "almost certainly traversed it to reach other tribes with whom they traded and participated in joint religious  ceremonies"; "[t]he Tribe also hunted, fished, and gathered on the parcel"; and "the Mechoopda negotiated a treaty with the federal government, which, if ratified, would have included the Chico parcel within the Tribe's reservation."  *Id.* (emphasis added).  The Court found that this rationale withstood arbitrary and capricious review.  *Id.* at 510.  So contrary to plaintiff's assertion, the Court did not "ma[k]e plain that the historical connection must be *in the vicinity* of the parcel, not necessarily to the parcel itself."  Pl.'s Mot. at 29 (emphasis in original).  And

although the Secretary in *Butte County* found that the Mechoopda tribe had a historical connection to the parcel in part because of the parcel's close proximity to the tribe's former rancheria, the Secretary also considered the tribe's connections to the parcel itself. 887 F.3d at 508.[23]

In sum, the agency provided a reasoned basis for its decision, which was based on the record. It did not overlook or ignore materials supplied by the Band; it considered them and supplied a rational connection between its assessment of those facts and its conclusions. *See Nat'l Ass'n of Clean Air Agencies*, 489 F.3d at 1228. Interior's findings cannot be said to be conclusory, unexplained, or unsupported, and therefore, from a pure administrative law perspective, the agency's application of Part 292 to the facts presented by Scotts Valley comports with the APA, whether the deference accorded is "muted" or robust.

But in this case, the review of agency action does not operate in a vacuum, and the equally important evaluation of the decision through the lens of the Indian canon of construction requires that the decision be vacated and remanded to the agency.

**B. The ILO does not take the government's role in weakening the historical connection between the Band and its land into account, and given the fundamental remedial nature of the restored lands exception and the Indian canon of construction, any ambiguity or doubt when applying the regulation must be resolved in favor of the Band.**

Plaintiff contends that because the ILO "failed altogether" to consider Congress's policy objectives for the IGRA, the decision should be remanded for further consideration. Pl.'s Mot.

---

23      *See also* Admin. R. [Dkt. # 127-2] at AR_NEW_0005402, *Butte County v. Hogen*, 08-cv-519 (submitted to district court) ("The land at issue here is located approximately 10 miles from the Tribe's former Rancheria. The former Rancheria site clearly is historically significant to the Tribe and we find it to be a proximate location to the subject parcels. . . . In this case, the Stipulation and Order restoring the Tribe to Federal recognition effectively precludes the Tribe from acquiring any trust lands for the purpose of gaming within the boundaries of the former Rancheria, even if those lands were available for purchase. Therefore, it is reasonable for the Tribe to seek a restoration of lands on a parcel that is located in close proximity to its former Rancheria, rather than within it.").

51

at 34.  And it is correct that the agency failed to grapple with the inescapable historical fact that Scotts Valley was a tribe that had its recognition and land stripped away by the federal government and its people scattered to the winds.  Nor did it address the fact that the purpose – the only purpose – of the IGRA exception at issue is to restore tribes in this position to some semblance of the status they enjoyed before, with the opportunity to sustain themselves economically.

At bottom, much of the assessment in the ILO is subjective, as the agency lacks quantitative standards to apply, notwithstanding the promulgation of Part 292.  The determination here turns upon the application of an imprecise adjective – "significant" – and this means that the agency was operating in an arena filled with ambiguity and discretion.

And that is exactly when the canon demands that any doubt be resolved in favor of the Tribe.

Even though this aspect of the case does not question the interpretation of a statute directly, because it seeks review of an ILO and how it applied a regulation that construes the statute, the Court is of the view that the canon bears on the analysis.  In the *CETAC* case, for example, when a non-profit organization opposed to gambling was challenging Interior's decision, based on reasoning set forth in an opinion letter, to take land into trust, the Court of Appeals found the decision to be a sufficiently formal interpretation of the IGRA to be subject to *Chevron* deference, but also subject to the Indian canon.  492 F.3d at 464–65, 471.  And in this case, Tahsuda announced in his "decision" that the Department had "determined" that the Parcel did not qualify

as restored lands "within the meaning of applicable law," that is, the statute.  ILO at 2, Admin. R.

at AR0011598.[24]

---

24      In *CETAC*, the Secretary relied upon an opinion letter issued by the Associate Solicitor for Indian Affairs when reaching his determination to take the land in trust, and it is true that the Court found the determination to be sufficiently formal to be due *Chevron* deference based in part on the fact that the decision and the letter upon which it was based had been published in the Federal Register.  *See* 492 F.3d at 467 ("The Secretary gave formal public notice in the Federal Register of the determination and the basis for it, including the opinion letter on which the Secretary relied.  Although publication in the [F]ederal [R]egister is not in itself sufficient to constitute an agency's intent that its pronouncement have the force of law . . . where, as here, that publication reflects a deliberating agency's self-binding choice, as well as a declaration of policy, it is further evidence of a *Chevron*-worthy interpretation.") (internal citation omitted).

Here, though, the Tahsuda letter can also be characterized as "a deliberating agency's self-binding choice," as he repeatedly refers to his determination about the applicability of the statutory "restored lands" exception as the "decision."  *See, e.g.*, ILO at 1, 2, Admin. R. at AR0011597, AR0011598.  And if there were any lingering doubts as to the finality of the ruling, the Assistant Secretary for Indian Affairs nailed the door shut when she denied the Band's request for reconsideration:

> The Department's regulations concerning administrative finality are clear: "[d]ecisions made by the Assistant Secretary – Indian Affairs [AS-IA] . . . shall be final for the Department and effective immediately unless the AS-IA provides otherwise in the decision."  25 C.F.R. § 2.6(c).  Here, no language in the Decision qualifies it as anything other than a final determination, or otherwise subject to further review within the Department.  Rather, the Decision is a final agency decision "subject to judicial review under 5 U.S.C. 704."  25 C.F.R. § 2.6(a).

Letter from Tara Sweeney, Assistant Sec'y – Indian Affs., U.S. Dep't of the Interior, to Shawn Davis, Chairman, Scotts Valley Band of Pomo Indians (Apr. 26, 2019), Ex. K to Decl. of Arlinda F. Locklear in Supp. of Mot. to Complete the Admin. Rec. [Dkt. # 28-2] ("April 26, 2019 Letter") at 1 (brackets in original); *see* Fed. Defs.' Opp. to Pl.'s Mot. to Complete the Admin. Rec. [Dkt. # 30] at 4–5, quoting April 26, 2019 Letter at 1.  Therefore, the observation in a footnote in *Butte County v. Hogen*, 613 F.3d 190, 195 n.3 (D.C. Cir. 2010), that ILOs are "advisory" and not binding on the persons vested with the authority to make final agency decisions is not applicable here; the ILO *was* the agency's final decision.  The Department has declared repeatedly in this litigation that its application of the statute in the decision comports with, and is therefore due the respect called for by, the APA, *see, e.g.*, Defs.' Mot. at 32 ("Interior applied the appropriate statutory and regulatory requirements and did not violate the APA."), and this is the precise circumstance when courts are required to consider the canon as well.

It is not clear from the ILO how the Band could ever attain a different result given how completely it was dispersed or what harm would flow to the United States from doing what is in its power to do to make up for the disadvantages the tribe now faces through no fault of its own.  Given the clear law in this circuit that directs district courts to favor the tribes, the Court concludes that it is incumbent upon it to deny the government's motion on these grounds and to grant the plaintiff's.

There is no question that "Congress enacted IGRA, in large part to 'provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments.'"  *Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852, 865 (D.C. Cir. 2006), quoting 25 U.S.C. § 2701(1).  The Circuit repeated that statement in *CETAC*, 492 F.3d at 462, 468, and added that this "primary purpose . . . is evident as well from the inclusion of several exceptions to the gaming prohibition on after-acquired lands in order to allow newly acknowledged or restored tribes to engage in gaming on par with other tribes."  *Id.* at 468; *see also Koi Nation*, 361 F. Supp. 3d at 50.

The notion that the exceptions were included in the statute to serve a remedial purpose is something the D.C. Circuit has underscored repeatedly.  In *City of Roseville*, the Court was focused on another aspect of the restored lands exception, but it spoke generally about the purposes of the exception and its remedial function:

> Had the Auburn Tribe never been terminated, it would have had opportunities for development in the intervening years, including the possible acquisition of new land prior to the effective date of IGRA.  A "restoration of lands" compensates the Tribe not only for what it lost by the act of termination, but also for opportunities lost in the interim.

348 F.3d at 1029; *see also id.* at 1030 ("[T]he exceptions in IGRA § 20(b)(1)(B) serve purposes of their own, ensuring that tribes lacking reservations when IGRA was enacted are not disadvantaged relative to more established ones."), 1032 (recognizing "the role that IGRA's

54

exceptions in § 20(b)(1)(B) play in the statutory scheme, namely to confer a benefit onto tribes that were landless when IGRA was enacted"). This was reiterated in 2018 in the *Butte County* decision, which stated that the restored lands exception "helps ensure 'that tribes lacking reservations when [the statute] was enacted are not disadvantaged relative to more established ones.'" 887 F.3d at 503, quoting *City of Roseville*, 348 F.3d at 1030.

This review of the purpose of the statute in the eyes of the Court of Appeals strengthens the Court's view that it will not forgo applying the canon because of the possibility that a favorable ruling for the Band could result in economic competition for another tribe. The point of this exception, according to the Circuit, was to provide some recompense – to place a tribe on an equal footing with other tribes that had not been rendered as unable to maintain a connection to their own land or that had been restored earlier. *See CETAC*, 492 F.3d at 468. Depriving the Band – which was not restored to federal recognition until 1991, three years after the IGRA was passed – of the benefit of the canon of construction at the behest of a better-positioned tribe would frustrate that policy and the purposes behind the canon itself.

Moreover, there is ample material in the ILO to support a finding in the Band's favor if all inferences are resolved to its benefit. The agency cited facts that weighed in the Band's favor, but then chose to devalue them.

First and foremost, this land was part of the territory that the Band's ancestors ceded *to* the United States in 1851. ILO at 7, Admin. R. at AR0011603. According to the Tahsuda letter, this creates an inference of a significant historical connection. ILO at 10, Admin. R. at AR0011606. But then the agency sets it aside and says, "well . . . what else have you got?" Even if the agency was correct when it concluded that neither of the two previous opinions plaintiff cited *required* the agency to find the necessary connection on this evidence alone, *see* ILO at 7, Admin. R. at

AR0011603, it is certainly a "significant" circumstance under any ordinary understanding of the meaning of the word, and Interior's parsimonious interpretation falls short of construing the law liberally and interpreting any ambiguous provision to the tribe's benefit, especially when one considers all of the things the Band could have done with its land in the years that went by before the United States acquired the Sugar Bowl Rancheria for the Band in 1911, or after 1958, when the government stripped the Band of that reservation and the recognition it had to litigate to restore.

Also, the agency declined to attribute Augustine's connections to the land to the Band as a whole, and it did so, in part, by characterizing the evidence as if it related to just one man, when even the information it described clearly indicated the presence of others in the region.  For example, the ILO states:

> The earliest reference to Augustine suggested by the Band seems to be on a list of Indian children baptized in 1837 at Mission San Francisco Solano, located in the city of Sonoma, 17 miles from the Parcel. . . . According to the Band, 29 other Pomo children were baptized at the mission at the time, at least 14 of whom were from the same village as Augustine, and at least two of whom were ancestors of the present-day Band.

ILO at 13, Admin. R. at AR0011609.  But this is later characterized by the agency as one of Augustine's "singular experiences," ILO at 17, Admin R. at AR0011613, as was the evidence that other "possible or confirmed Band ancestors [were] living in Napa in 1870" and may have been working at a rancho approximately 11 miles north of the Vallejo Parcel.  ILO at 14–15, Admin. R. at AR0011610–11.

The Court recognizes that it is not its role to scour through the ILO and substitute its judgment for that of the agency.  *See State Farm*, 463 U.S. at 43.  The point of these examples is to illustrate that while one can read the opinion with only a *Chevron* hat on and nod along, a different outcome is required if one gives the Band the benefit of every inference and interprets the restored lands exception and the regulation adopted to clarify – but not narrow – it in a manner

56

that resolves any doubt in the Band's favor.  Therefore, the Court will grant plaintiff's motion for summary judgment on this issue and find the ILO to be arbitrary and capricious.

## IV.    The agency's decision was not procedurally deficient.

Plaintiff also challenges the ILO on the grounds that then-Principal Deputy John Tahsuda lacked the delegated authority to issue the opinion.  Pl.'s Mot. at 11–15.

The IRA authorizes the Secretary of the Interior to acquire land into trust for the benefit of Indian tribes.  *See* 25 U.S.C. § 5108.  The IGRA accords the Secretary the discretion to determine when exceptions apply to the prohibition of gaming on these lands.  *See* 25 U.S.C. § 2719(b)(1)(A); *see also* Pl.'s Mot. at 11; Defs.' Mot. at 37.  Interior's Departmental Manual ("DM") gives the Secretary "broad power to delegate authority," DM, Part 200, Chapter 1, Section 1.2, https://www.doi.gov/sites/doi.gov/files/elips/documents/200-dm-1.pdf; and in turn, "the Assistant Secretary – Indian Affairs is authorized to exercise all of the authority of the Secretary."  DM, Part 209, Chapter 8, Section 8.1, https://www.doi.gov/sites/doi.gov/files/elips/documents/209-dm-8.pdf.[25]

Pursuant to Part 109 of the DM:

> The Assistant Secretary – Indian Affairs discharges the duties of the Secretary with the authority and direct responsibility to strengthen the government-to-government relationship with Indian tribes; advocate policies that support Indian Self-Determination; protect and preserve Indian trust assets; and administer a wide array of laws, regulations, and functions relating to Indian tribes, Alaska Natives, individual Indian tribal members, and Indian affairs that are vested in the Secretary by the President and the Congress of the United States.

---

[25]    Portions of the Departmental Manual, including this provision, have been provided to the Court.  *See, e.g.*, DM, Ex. 9 to Defs.' Mot. [Dkt. # 48-9].  Because all portions of the Manual can be accessed at https://www.doi.gov/elips/browse, the Court will cite to the version available online.

DM,                  Part 109,                  Chapter                  8,                  Section                  8.1,
https://www.doi.gov/sites/doi.gov/files/elips/documents/109-dm-8.pdf [hereinafter 109 DM 8].

The Assistant Secretary – Indian Affairs may also redelegate authority, including "general administrative authority and those program authorities specifically related to the functions and responsibilities assigned to the Assistant Secretary – Indian Affairs in 109 DM 8."  DM, Part 209, Chapter  8,  Section  8.3,  https://www.doi.gov/sites/doi.gov/files/elips/documents/209-dm-8.pdf. But any "[r]edelegations of authorities made by Assistant Secretaries" must be "issued in the form of Departmental Manual releases only,  and published in the appropriate Parts of the 200 Series of the     Departmental     Manual."     DM,   Part   200,   Chapter   3,   Section 3.4, https://www.doi.gov/sites/doi.gov/files/elips/documents/200-dm-3.pdf.     "No  other  form  of redelegation     is     authorized."     DM,   Part   209,   Chapter   8,   Section   8.3, https://www.doi.gov/sites/doi.gov/files/elips/documents/209-dm-8.pdf.

Part 110 of the Departmental Manual details how the Office of the Assistant Secretary – Indian Affairs is to be organized.  The role of the Assistant Secretary for Indian Affairs is set out:

> The Assistant Secretary – Indian Affairs discharges the duties assigned by the Secretary and provides direction and leadership over the Office of the Assistant Secretary – Indian Affairs (ASIA), the Bureau of Indian Affairs (BIA), and the Bureau of Indian Education (BIE).  The Assistant Secretary – Indian Affairs carries out the duties of the office with the assistance of a Principal Deputy Assistant Secretary and Deputy Assistant Secretaries who report to the Principal Deputy Assistant Secretary.

DM,                  Part                  110,                  Chapter                  8,                  Section                  8.1,
https://www.doi.gov/sites/doi.gov/files/elips/documents/110-dm-8_0.pdf.  The Principal Deputy Assistant Secretary's ("PDAS") role is also detailed:

> The [PDAS] serves as the first assistant and principal advisor to the Assistant Secretary – Indian Affairs in developing and interpreting program policies affecting Indian Affairs (IA) and discharges the duties assigned by the Assistant Secretary – Indian Affairs.  The PDAS manages, directs, and coordinates   functions   to   strengthen   the   government-to-government

> relationship with Indian tribes and Alaska Native villages in support of the
> Federal policy of Indian Self-Determination; is responsible for new and
> revised regulations to address new statutory requirements; development and
> management of the IA dispute resolution program . . . ; and regulation of
> Indian gaming.

DM, Part 110, Chapter 8, Section 8.2, https://www.doi.gov/sites/doi.gov/files/elips/documents/110-dm-8_0.pdf [hereinafter 110 DM 8.2].

The same section of the Departmental Manual that authorizes the Assistant Secretary – Indian Affairs to exercise all of the authority of the Secretary also specifically provides for a role to be played by the PDAS. This official "is delegated all program and administrative authorities of the Assistant Secretary – Indian Affairs necessary to fulfill the responsibilities identified in 110 DM 8.2," DM, Part 209, Chapter 8, Section 8.4, https://www.doi.gov/sites/doi.gov/files/elips/documents/209-dm-8.pdf, which includes, as set forth above, "regulation of Indian gaming." DM, Part 110, Chapter 8, Section 8.2, https://www.doi.gov/sites/doi.gov/files/elips/documents/110-dm-8_0.pdf. Indeed, the Office of Indian Gaming reports to the PDAS. *Id.*

The tribe argues that Tahsuda lacked the delegated authority to render the ILO because there was neither a "specific redelegation of authority held by AS-IA [("Assistant Secretary – Indian Affairs")] to make decisions on ILOs," nor "a general redelegation of all authority held by the AS-IA to the PDAS, comparable to that from the Secretary to the AS-IA." Pl.'s Mot. at 13. This does not invalidate the opinion in the Court's view. The Manual clearly accords the Principal Deputy Assistant Secretary "all program and administrative authorities" of the Assistant Secretary necessary to fulfill the responsibilities in Part 110, subject only to the limitations set out in 200 DM 1, which do not bear on the issue at hand. DM, Part 209, Chapter 8, Section 8.4,

https://www.doi.gov/sites/doi.gov/files/elips/documents/209-dm-8.pdf.[26]      The  PDAS  is

authorized to exercise program and administrative authority over the regulation of Indian gaming.

Since a tribe that seeks to game on newly acquired lands must submit a request for an opinion to

the Office of Indian Gaming, 25 C.F.R. § 292.3, and the Office of Indian Gaming reports directly

to the PDAS, the Manual and the structure of the agency support the conclusion that the PDAS

can consider and issue Indian Lands Opinions to determine whether a tribe may game on certain

lands.   In sum, the Principal Deputy's authority over the "regulation of Indian gaming" was

delegated from the Assistant Secretary, and in turn, from the Secretary, who has the statutory

authority to regulate gaming on Indian lands.  *See* 25 U.S.C. § 2719.[27]

Therefore, the Court finds that the then-Principal Deputy Assistant Secretary – Indian

Affairs had the delegated authority to issue the ILO that plaintiff challenges in this case.

---

26      The limitations in "200 DM 1" restrict "any officer or employee of the Department [from] exercis[ing] authority which the Secretary by the terms of the legislation, Executive order or other source of authority may not redelegate."   DM, Part 200, Chapter 1, Section 1.2, https://www.doi.gov/sites/doi.gov/files/elips/documents/200-dm-1.pdf.  There are other "general limitations" set out in this section of the Manual, such as "authority to issue documents in the Code of Federal Regulations initiated by the Department of the Interior," "conducting official correspondence with the president," and "perform[ing] legal work related to the function designated."  *Id.* at Section 1.6.  None of these limitations appear to be applicable.

27      The tribe also argues that Interior's 2008 guidance clarifies that it is primarily the Office of Indian Gaming that must make restored lands recommendations to the Assistant Secretary – Indian Affairs.  Pl.'s Mot. at 16–18.  Even if this guidance is current – which defendants maintain it is not – the guidance does not suggest that the PDAS may *not* play a role in the ILO process, and there is no evidence in the record to support plaintiff's contention that OIG was "exclude[ed]" from the decision-making process.  *See* Mem. from Carl J. Artman, Assistant Sec'y – Indian Affs., to Assoc. Solic., Div. of Indian Affs. and Dir., Off. of Indian Gaming (May 22, 2008), Ex. 1 to Pl.'s Mot. [Dkt. # 48-4].

## CONCLUSION

The Court finds that the Department of the Interior did not act outside of its statutory authority under the Indian Gaming Regulatory Act or the Indian Reorganization Act when it promulgated Part 292, a regulation requiring tribes to demonstrate a "significant historical connection" for purposes of the restored lands exception.  But it concludes that the agency's application of its regulation to the Band under the particular factual circumstances of this case was inconsistent with the canon of Indian construction and clear policy behind the IGRA and the restored lands exception, and therefore, the February 7, 2019 ILO cannot withstand arbitrary and capricious review.  Plaintiff's motion for summary judgment will therefore be **GRANTED** with respect to the question of whether the ILO was arbitrary and capricious when considered in accordance with the Indian canon of statutory construction, and **DENIED** with respect to whether Part 292 violates the IGRA or the IRA, and whether the agency's decision is a result of a flawed decision-making process.  Defendants' cross-motion for summary judgment will be **GRANTED** with respect to the questions of whether the agency exceeded its statutory authority in issuing Part 292, whether it was lawful for the then-Principal Deputy Tahsuda to issue the ILO, and whether the agency otherwise followed appropriate procedures, but it will be **DENIED** with respect to whether the ILO was arbitrary and capricious.

Therefore, the Court will remand the ILO to the agency for further proceedings consistent with this opinion.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  September 30, 2022